2000 SD 26

**Wendy S. ZAHN, Plaintiff and Appellant,**

**and**

**Daryl C. Zahn Plaintiff,**

**v.**

**Roy J. MUSICK, Defendant and Appellee.**

**Nos. 20985, 20988.**

Supreme Court of South Dakota.

Considered on Briefs Jan. 10, 2000.

Decided Feb. 16, 2000.

Charles Poches, Jr. of Poches and Lee, Fort Pierre, for plaintiff and appellant.

Larry M. Von Wald of Truhe, Beardsley, Jensen, Helmers and Von Wald, Rapid City, for defendant and appellee.

SABERS, Justice.

[¶ 1.] Roy Musick admitted liability in a personal injury action brought by Wendy Zahn. A jury awarded Zahn $3,000 in damages. She made a motion for a new trial based on admissions and inadequacy of the award, which was denied. The trial court granted both parties' application for taxation of costs. Zahn appeals and Musick files a notice of review. We affirm in all respects, except for the taxation of the disbursement for an "investigative videotape" against Zahn, which we reverse.

## FACTS

[¶ 2.] On June 6, 1996, Musick was driving a tractor in the right-side lane of two westbound lanes while pulling a haystack mover. Zahn, also traveling westbound, was driving her car in the left lane. Zahn was attempting to pass the haystack mover on a bridge when the mover struck the right side of the bridge. The impact caused the mover to separate from the tractor and collide with Zahn's car. Several teeth on the haystack mover penetrated Zahn's car, shattered most of the windows and pinned the car against a concrete divider.

[¶ 3.] Stanley County Highway Superintendent Arlen Bouchie came upon the accident scene. He testified that the interior of the car was filled with glass. The doors to the car could not be opened and the driver's side window would not roll down. Bouchie helped Zahn out of her car through the rear window. Zahn was wearing shorts with nylons and was covered with glass fragments. Even though Bouchie saw no visible injuries requiring medical assistance, he asked Zahn whether she wanted to go to the emergency room. Zahn replied that it was not necessary. Bouchie gave Zahn a ride to Rushmore Nursing, where she was employed.

[¶ 4.] After arriving at work, Zahn's coworkers convinced her to go to a medical clinic to be examined. She saw a physician's assistant at the clinic who applied a steri-strip to a cut on her hand and told her to go home and shower to wash off any bits of glass that may be on her skin. She was not hospitalized for any injury resulting from the accident.

[¶ 5.] Five days after the accident, Zahn was examined by her family physician, Dr. Bartholomew. He took some x-rays and noted some contusions, but did not recommend any treatment. She also saw Dr. Keller, a chiropractor, for five treatments during July and August.

[¶ 6.] On July 26, 1996, Zahn went to Dr. Eisnach, an optometrist, because she began experiencing "floaters" in her vision. After Dr. Eisnach rendered the diagnosis, Zahn went to a second optometrist who also diagnosed her with "floaters." She was then referred to Dr. Abraham, an ophthalmologist, who determined she had a mild case of vitreous floaters [1] that was not caused by the accident. Dr. Abraham concluded that treatment was not necessary.

[¶ 7.] In December of 1996, Zahn saw Dr. Stout. Dr. Stout found nothing objectively wrong with her and referred her to Dr. Payne, a neurologist. Dr. Payne conducted several tests and was unable to find any neurological problems. He did not prescribe any treatment. After her appointment with Dr. Payne in January of 1997, Zahn did not see another medical doctor until July of 1998.

[¶ 8.] On April 4, 1997, a summons and complaint were served on Musick. The complaint alleged that:

> As a result of such collision, plaintiff suffered severe and permanent injuries to both eyes, her back, head, arms and fingers. Plaintiff has suffered serious mental anguish and physical pain and will continue to suffer such in the future, including, but not limited to, glass imbedded in her body; aches of the head, neck, back, arms and fingers which include numbness; partial loss of eyesight in both eyes; and other injuries.

Zahn's husband at the time of the accident also sued Musick for loss of consortium.

[¶ 9.] In his amended answer, Musick admitted that he was liable for causing the accident. Therefore, the only issue in dispute was damages. Musick made two separate offers of judgment before trial. On March 26, 1998, he offered $6,000, but Zahn rejected the offer. On December 31, 1998, he served Zahn with a second offer of judgment for $10,000. Zahn also rejected this offer.

[¶ 10.] During the trial on January 20–21, 1999, several inconsistencies in Zahn's claimed injuries surfaced.

[¶ 11.] First, Zahn testified that she did not have any problems with her neck, arms

---

1. This condition is described as follows:
   Vitreous floaters are small clumps of gel that form the vitreous, the clear jelly-like fluid that fills the inside cavity of the eye. These floaters, which can be in the form of little dots, circles, lines, or cobwebs, by themselves are usually of little importance and are common in nearsighted people.... Lawyers' Medical Cyclopedia § 39.13 n. 12 (4th ed. 1999).

or fingers prior to the accident. However, on cross-examination, she admitted that she had been seen at a medical clinic just two months before the accident for stiffness and discomfort in the joints of her fingers, wrists, elbows and knees. During this appointment, she underwent testing to determine whether she suffered from rheumatoid arthritis, but the test results were negative. Zahn testified that the doctor suggested that she has a thyroid problem, but no treatment was administered.

[¶ 12.] Second, Zahn testified that she had never experienced any neck pain prior to the accident. On cross-examination, she admitted that she saw Dr. Keller, a chiropractor, in March of 1996 for neck pain she experienced after lifting a railroad tie.

[¶ 13.] Third, Zahn testified at trial that she may have struck her head or lost consciousness. However, during her deposition, she testified that she did not lose consciousness. Medical records also provide that Zahn told Dr. Abraham that she did not hit her head in the accident.

[¶ 14.] Fourth, Zahn testified that the accident had caused "floaters" in her eyes resulting in a disruption in her eyesight. She specifically stated that she did not experience these "floaters" before the accident. On cross-examination, she admitted that she had been diagnosed with "floaters" in her left eye ·approximately one year before the accident. Dr. Abraham, a vitreoretinal surgeon with the Black Hills Regional Eye Institute, also testified by deposition that Zahn had a mild to moderate case of vitreous condensation and floaters which was not caused by the accident. No treatment was recommended.

[¶ 15.] Fifth, Zahn claimed that two fingers on her right hand are continuously numb and a third one is occasionally numb all as a result of the accident. She admitted on cross-examination that Dr. Payne was unable to confirm that she had any numbness in these three fingers.

[¶ 16.] Sixth, at the time of the accident, Zahn was working at least 40 hours at Rushmore Nursing. She continued to work after the accident in assisting primarily elderly and disabled patients at their homes with bathing, taking medications, changing clothing, and light housework. She also continued to work 15 hours per week at the Fort Pierre Livestock Auction. At trial, she testified that she sought the wages she lost when she had to obtain medical care for the injuries she sustained in the accident. However, in her deposition, she testified that she sought no claim for lost wages.

[¶ 17.] Finally, Zahn complained that due to the accident she · is in constant discomfort and is unable to lift her arm up over her head. Despite the alleged injuries, Zahn played softball during the summer of 1996 and every summer thereafter. During trial, she acknowledged that a videotape was made of her playing a doubleheader in softball. She admitted that the video showed her batting and getting hits, running the bases at full speed, running after fly balls, and throwing the ball from the outfield. Likewise, she admitted that she played volleyball during the winters after the accident. During volleyball, she would set the ball, serve, dive and dig for the ball. She also enjoyed dancing on occasion after the softball games and rode her bicycle regularly. She even water skied once, but claimed it hurt her shoulder so she quit. Some of these post-accident activities would be difficult to perform if she could not lift her arm over her head.

[¶ 18.] At the time of the accident, Zahn had been married to Daryl Zahn, for the second time, for three years. They divorced, for the second time, approximately a year and a half after the accident. Daryl testified that after the accident, Zahn's disposition changed from a happy person to an irritable one, she wanted to be alone more often, she appeared disinterested in

him and she wasn't able to contribute to the family as she did before the accident. Zahn and Daryl both claim that the accident was the sole cause of the deterioration of their second marriage.[2] After not talking to him for approximately one month, Daryl asked Zahn and her children to leave, gave her some money for the divorce and went elk hunting. They never sought marriage counseling or tried to reconcile.

[¶ 19.] During closing argument, Zahn asked the jury to award her $157,000 in damages and $7,000 to Daryl for his loss of consortium claim. After alerting the jury to all the inconsistencies in Zahn's testimony, Musick asked the jury to return a verdict for $2,977.25.

[¶ 20.] The jury returned a general verdict form awarding Zahn $3,000 in damages and zero to Daryl. After the trial, Zahn made a motion for a new trial, which was denied. Musick and Zahn each filed an application for taxation of costs. The trial court granted Musick's application because the jury verdict was "not more favorable" than Musick's offer of judgment. See SDCL 15–6–68. The trial court also granted Zahn's application because Musick failed to submit timely written objections to Zahn's application. See 15–6–54(d).

[¶ 21.] Zahn appeals raising the first five issues. Musick raises the sixth issue by notice of review.

[¶ 22.] **1. WHETHER JUDICIAL ADMISSIONS OF LIABILITY FOR SOME INJURIES AND DAMAGES WERE BINDING ON MUSICK.**

■ [¶ 23.] Zahn argues that Musick's attorney made admissions of injury and

damages in the amended answer, opening statement, voir dire, proposed instructions and closing argument.

[¶ 24.] In the amended answer, Musick stated:

Defendant, for purposes of this litigation only, admits legal liability for any injuries which Plaintiffs may have suffered, proximately resulting from the accident which is the subject of this litigation.

During voir dire, Musick's attorney told the jury that Zahn's car was "totaled" and "damaged very severely." He further stated:

The issue as far as Mr. Musick is concerned is Mr. Musick's position is he accepts responsibility for the accident, but he takes issue with the extent of damages that are being claimed and injuries that are being claimed by Ms. Zahn.

In his opening statement, Musick's attorney stated: "the damage to the car, the evidence will show, was severe." He continued: "[But] the [c]ourt has already instructed you that there's no claim being made for the damage to the car. That's been resolved." He further stated:

We're going to be asking you to return verdicts that are totally inconsistent with the claims that are being made in this case, but which shall be consistent with the evidence that shall be put before you. We will be asking you to return a verdict that is consistent with the cuts that didn't require stitching, and the glass that went under the skin that came out.

Musick also proposed instructions which provided that Musick accepted responsibil-

---

**2.** The first marriage ended after Zahn's six-year-old son choked on a peanut and aspirated it in his lung. The boy was in three different hospitals before the peanut could be removed from his lung. He had the peanut removed at a Minneapolis hospital and he remained there in intensive care for approxi-

mately three days. During this time, Zahn admitted that she was "stressed out" and not easy to live with.

Upon returning home from Minneapolis, the couple got into an argument while cooking supper. Zahn suggested they get a divorce and they did.

ity for the accident, but he disputes the "proximate cause of all the injures and damages which plaintiff Wendy Zahn claims to have sustained."

[¶ 25.] During closing argument, Musick's attorney again stated that Musick "accepts responsibility for any injuries or damages that anybody has sustained in this case." In establishing what Musick thought he was responsible for, he stated:

> Ms. Zahn was in this accident. She had some cuts. She was examined. She had the cuts cleaned up. She didn't have stitches. There would be some medical expense associated with that. And I believe that if you look at the exhibit they introduced, they said that was $233 including a subsequent appointment with Dr. Bartholomew. That was right after the accident. It was $233.

> Well given that the–there was obviously quite an impact in that accident, I think it would be reasonable to be thoroughly checked, checked from head to toe. Who did that? Well, there was an appointment with Dr. Stout and then he referred her to Dr. Payne. He did all the diagnostic tests. He found out they were all normal. That was a reasonable thing to do.

> Because you have glass flying about in the accident, it would have also been reasonable to go get your eyes checked thoroughly. Dr. Bartlett, right over here on the corner, found right after the accident they were okay. And Dr. Abraham, a specialist, confirmed that they were okay. That was probably a reasonable thing to do to go check that out.

> So I'm going to suggest to you, Ladies and Gentlemen, that you return a verdict for Wendy Zahn in the amount of her expenses for Dr. Bartholomew, $233.25; Dr. Abraham in the amount of $262; Dr. Stout in the amount of $167; Dr. Payne, $892; MRI and x-rays for $1,386. Fair to check all that out. If my addition is correct, that's $2,977.25.

[¶ 26.] Zahn argues that these statements were judicial admissions that the collision was severe and that she sustained cuts and imbedded glass. She further argues that the statements during closing argument were specific and detailed statements of expense rather than a general damage statement. In light of these admissions, she claims the jury should have awarded her an amount for her pain and suffering, loss of wages and other damages.

[¶ 27.] "A judicial admission is a formal act of a party or his attorney in court, dispensing with proof of a fact claimed to be true, and is used as a substitute for legal evidence at the trial." *Harmon v. Christy Lumber, Inc.*, 402 N.W.2d 690, 692–93 (S.D.1987) (citations omitted). "An admission is 'limited to matters of fact which would otherwise require evidentiary proof,' and cannot be based upon personal opinion or legal theory." *Tunender v. Minnaert*, 1997 SD 62, ¶ 21, 563 N.W.2d 849, 853 (quoting *Baxter v. Gannaway*, 113 N.M. 45, 822 P.2d 1128, 1133 (N.M.Ct.App. 1991)). "[A]n attorney can make an admission ... that is binding upon his client and relieves the opposing party of the duty to present evidence on that issue." *Rosen's Inc. v. Juhnke*, 513 N.W.2d 575, 577 (S.D.1994) (citations omitted).

[¶ 28.] Musick consistently made judicial admissions that he caused the accident, but denied that all of the injuries complained of by Zahn were a proximate result of the accident. These admissions were made in the pleadings and throughout the trial. Musick did not, however, concede that Zahn suffered any pain or suffering. Nor did he concede that Zahn was entitled to damages above the amount of $2,977.25. Any damage award beyond $2,977.25 remained disputed.

**[¶ 29.] 2. WHETHER THE JURY AWARD WAS INADEQUATE OR GIVEN UNDER THE INFLUENCE OF PASSION OR PREJUDICE.**

■ [¶ 30.] Zahn asserts that her total medical costs from this accident were $7,042.33. She argues that due to Musick's judicial admissions, the following awards should have been included in the jury's verdict, but were not: (1) 15 hours in lost wages; (2) over-the-counter medications amounting to $110; and (3) a prescription for a TENS unit costing her $84.92. She further argues that she suffered post-traumatic stress disorder, vision impairment, physical disability, and constant pain as a result of the accident and should have been compensated accordingly. She asserts that "a jury cannot award recovery for medical expenses and without reason deny recovery for the very injuries necessitating the medical expenses." *Morrison v. Mineral Palace,* 1998 SD 33, ¶ 9, 576 N.W.2d 869, 871 (quoting *Gould v. Mans,* 82 S.D. 574, 576–77, 152 N.W.2d 92, 93 (S.D.1967) (citations omitted)).

■ [¶ 31.] In reviewing a jury award, we have stated: "If the jury's verdict can be explained with reference to the evidence, rather than by juror passion, prejudice or mistake of law, the verdict should be affirmed." *Miller v. Hernandez,* 520 N.W.2d 266, 272 (S.D.1994) (citation omitted). Thus, "if a verdict is susceptible to more than one construction, the construction which sustains the verdict must be applied." *Morrison,* 1998 SD 33, ¶ 11, 576 N.W.2d at 872 (quoting *Freeman v. Berg,* 482 N.W.2d 32, 35 (S.D.1992)) (citing *Bankwest, Inc. v. Valentine,* 451 N.W.2d 732, 736 (S.D.1990); *Fjerstad v. Sioux Valley Hospital,* 291 N.W.2d 786, 788 (S.D.1980); *Baker v. Jewell,* 77 S.D. 573, 580, 96 N.W.2d 299, 304 (1959)). Neither the trial court nor this court may set aside a verdict unless it is clearly "unreasonable, arbitrary and unsupported by the evidence." *Kus-*

*ser v. Feller,* 453 N.W.2d 619, 621 (S.D. 1990) (citing *Lewis v. Storms,* 290 N.W.2d 494, 497 (S.D.1980)).

[¶ 32.] In reviewing jury verdicts approximating the medical expenses proven in a personal injury action, we have stated:

> An adequate verdict cannot be guaranteed by the courts to every plaintiff who prevails in a personal injury action and we are not willing to adopt an inflexible rule which would in effect render every verdict approximating a plaintiff's medical expenses inadequate and invalid as a matter of law. Such verdicts have been sustained and explained by the courts on various grounds such as: the jury ... does not believe the amount of medical expenses is reasonable or proximately caused by defendant's neglect[.]

*Itzen v. Wilsey,* 440 N.W.2d 312, 314 (S.D. 1989) (quoting *Gould,* 82 S.D. at 577, 152 N.W.2d at 93 (citations omitted)).

[¶ 33.] In this case, the credibility of Zahn was a substantial factor. Zahn testified that she was in constant pain, yet she admitted to playing softball **and** volleyball, riding her bicycle and dancing. She claimed and testified that she had no pre-existing conditions in the physical areas that she alleges are injured by this accident. On cross-examination, however, she admitted that she had neck problems, joint stiffness, and was diagnosed with "floaters" one year before the accident.

[¶ 34.] Clearly, proximate cause in this case was "highly suspect." *See Itzen,* 440 N.W.2d at 316 (Henderson, J., specially concurring). Dr. Abraham testified, by deposition, that Zahn's "floaters" were not caused by the accident. Dr. Stout and Dr. Payne both testified that they could find nothing objectively wrong with Zahn. Given the lack of corroborated medical evidence, Zahn's pre-existing medical conditions and her substantial post-accident recreational activities, the jury may have reasonably concluded that the claimed

medical expenses and injuries were not proximately caused by Musick's negligence. Additionally, the jury may have awarded $22.75 for the pain and suffering Zahn experienced as Musick asked the jury to return a verdict of $2,977.25 and they returned a $3,000 verdict.

[¶ 35.] We recognize that the jury was entitled to determine how much of Zahns' testimony was credible. Viewing the evidence in a light most favorable to the verdict, it has not been shown to be inadequate.

[¶ 36.] **3. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN REFUSING TO ADOPT ZAHN'S PROPOSED SPECIAL VERDICT FORM.**

[¶ 37.] Zahn proposed a special verdict form which would require the jury to designate damages on an individual basis to the following claimed injuries: (1) cost of medical care and expense to date; (2) cost of medical care reasonably certain to occur in future; (3) disfigurement and disability; (4) hurt, suffering and pain experienced by Zahn to date; (5) hurt, suffering and pain reasonably certain to occur in the future; (6) bodily injury; (7) loss of enjoyment of life to date; and (8) future loss of enjoyment of life reasonably certain to occur in the future.

[¶ 38.] Instead of adopting Zahn's proposed special verdict form, the trial court used a general verdict form, which provided, in part:

QUESTION 1: What is the total amount of damages sustained by plaintiff Wendy Zahn as a proximate result of the automobile/farm machinery accident which occurred on June 26, 1996?

ANSWER: $_____.

[¶ 39.] Zahn claims that this general verdict form does not allow this court to determine what, if any, damages were award-

ed for each type of injury. *See Miller*, 520 N.W.2d at 271. She argues that the trial court abused its discretion in refusing to use her proposed form; and, if it had, there would be no question as to what the jury did or failed to do.

[¶ 40.] The use of a special verdict form is governed by SDCL 15-6-49(a), which provides, in part:

The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate.

Due to the permissive language of the statute, the decision to use a special verdict form is within the purview of the trial court's discretion. *Miller*, 520 N.W.2d at 270. Therefore, we will not disturb the trial court's decision unless we determine it was not "justified by, and [was] clearly against, reason and evidence." *Kanta v. Kanta*, 479 N.W.2d 505, 507 (S.D.1991) (citations omitted).

[¶ 41.] Special verdict forms are particularly helpful when complex causes of action or multiple parties are involved. *Miller*, 520 N.W.2d at 270 (citations omitted). They are also helpful when the law is unsettled or is evolving or when a statute of limitations issue is involved. *Id.* at 270, 271. A statute may also suggest or require that a special verdict form be used. *Id.* at 271. However, the use of special verdicts is reserved for determining the ultimate issues in a case:

Special verdicts are not justified for the 'mere purpose of cross-examination of

the jury to create error for the record.' If used, it should be for ultimate issues and not something akin to a[c]ourt's findings of fact in a court trial.

*Id.* at 270 (citations omitted).

[¶ 42.] We have also advised trial courts to use special interrogatories in order to avoid confusion:

Trial courts would be well advised in cases such as this to submit special interrogatories to the jury regarding the amount awarded for each element of damages. Such a practice would eliminate confusion over what part of the award, if any, was for such services, and aid in meaningful appellate review.

*Stormo v. Strong,* 469 N.W.2d 816, 825 (S.D.1991).

[¶ 43.] While Zahn's proposed special verdict form would have eliminated confusion over what damages were awarded by the jury on each of the types of damages claimed, it was not an abuse of discretion to use this general verdict form. The jury was properly instructed on proximate cause and on Zahn's damages: pain and suffering in the past and future, lost wages and reasonable medical expenses. The jury completed a general verdict form, which separated the ultimate issues of Zahn's personal injury claims from the loss of consortium claim of her ex-husband. *Compare Miller,* 520 N.W.2d at 271 (noting that the court and parties agreed to use a special interrogatory to determine how to calculate prejudgment interest, but failed to do so).

[¶ 44.] Although special interrogatories would have been helpful to appellate review in this case, the jury instructions and the general verdict form were correct, even though general, and the real problem appears to be lack of proof rather than

lack of specificity. Therefore, it has not been shown that the trial court abused its discretion in refusing to use Zahn's proposed special verdict form.

[¶ 45.] **4. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING ZAHN'S MOTION FOR A NEW TRIAL.**

[¶ 46.] Zahn argues that a new trial must be granted because the verdict was inadequate in light of the judicial admissions by Musick.

[¶ 47.] As discussed under Issue 1, we determined that Musick made judicial admissions that Zahn was entitled to $2,977.25 in damages. Zahn was awarded $3,000. Under Issue 2, we determined that the jury's verdict was not shown to be inadequate. We have repeatedly stated that a new trial cannot be granted merely because the verdict reflects either a liberal or conservative attitude or because it is larger or smaller than a party believes it should be. *See, e.g., Freeman,* 482 N.W.2d at 35; *Kusser,* 453 N.W.2d at 621; *Itzen,* 440 N.W.2d at 313; *Stoltz v. Stonecypher,* 336 N.W.2d 654, 657 (S.D.1983); *Weidner v. Lineback,* 82 S.D. 8, 140 N.W.2d 597, 603 (1966). Based on the foregoing determinations, it has not been shown that the trial court's denial of Zahn's motion for a new trial was an abuse of discretion.

[¶ 48.] **5. WHETHER THE TRIAL COURT ERRED IN GRANTING MUSICK'S APPLICATION FOR TAXATION OF COSTS FOR COPIES AND FOR AN INVESTIGATIVE VIDEOTAPE.**

[¶ 49.] The trial court correctly ordered Zahn to pay for the costs incurred by Musick after March 22, 1998, the date of the first offer of judgment.[3] However,

---

**3.** The offer of judgment statute, SDCL 15–6–68, provides, in relevant part:

At any time more than ten days before the trial begins, a party defending against a

these costs included $241.75 for making 899 copies, and $1,162.62 for an investigative videotape. Zahn argues that the copying expense is excessive and is not a compensable cost because it was not an expense incurred in preparing exhibits, in responding to discovery, or furnishing information to counsel or to the court.

[¶ 50.] SDCL 15–17–37 provides:

The prevailing party in a civil action or special proceeding may recover expenditures necessarily incurred in gathering and procuring evidence or bringing the matter to trial. Such expenditures include costs of telephonic hearings, costs of telephoto or fax charges, fees of witnesses, interpreters, translators, officers, printers, service of process, filing, expenses from telephone calls, copying, costs of original and copies of transcripts and reporter's attendance fees, court appointed experts and other similar expenses and charges. These expenditures are termed 'disbursements' and are taxed pursuant to § 15–6–54(d).

We review the award of disbursements under an abuse of discretion standard. *High Plains Genetics Research, Inc. v. JK Mill–Iron Ranch*, 535 N.W.2d 839, 846 (S.D.1995).

[¶ 51.] The trial court found that the copies were made in preparation for trial and were not excessive. During the hearing, Musick explained:

[T]he large number of copies shortly before trial has to do with a practice to make copies of all of the depositions in triplicate, one so that we have one available, one for the witness, and sometimes one for the Court if that's requested and even for the Court's clerk. It's a matter of preparation for trial.

The record reflects that the depositions of Dr. Abraham and Dr. Ahrlin were read to the jury during the presentation of Musick's case. The trial court was satisfied that the photocopying expenses were "necessarily incurred in gathering and procuring evidence or bringing the matter to trial." SDCL 15–17–37. The trial court was in the best position to determine the reasonableness of these disbursements and no abuse of discretion is shown. We affirm the award of the costs of copies to Musick.

[¶ 52.] Zahn further argues that the investigative videotape, of Zahn playing a double-header softball game, was not necessary and is not compensable under SDCL 15–17–37. More specifically, she argues that, during her deposition and in her answers to interrogatories, she admitted to playing softball and volleyball after the accident. She further contends that the investigative videotape was not introduced as evidence at trial nor did the investigator testify. Based on the above, Zahn argues the tape was not a necessary expense under SDCL 15–17–37 nor does it fall under the statutory term "other similar expenses and charges."

[¶ 53.] Musick argues that the investigative videotape was a necessary expense incurred to gather evidence for trial. He asserts that even though it was not used at trial, several references were made to it during trial. He further contends: "[i]ts

claim may serve upon the adverse party an offer to allow judgment to be taken against him for the money or property or to the effect specified in his offer, with costs then accrued. If within ten days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs. *If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.* (emphasis added).

existence, and ready availability, foreclosed any suggestion by [Zahn] or her attorneys that she played softball, but with some restriction, or that she played for a period of time after the accident but was unable to continue." Although we agree with Musick's comments, we do not agree that they necessarily make an "investigative videotape" a taxable cost or disbursement under SDCL 15–17–37.

[¶ 54.] The legislative history shows that, prior to 1992, the statute authorizing costs provided:

> In all cases where a party is allowed to recover costs the clerk must also tax as a part of the judgment the allowance of such party's witnesses', interpreters', translators', officers', and printer's fees, fees for the service of process, filing fees and the necessary expense of taking depositions and procuring necessary evidence.

SDCL 15–17–4. The State Bar of South Dakota proposed to change this statute in order to "eliminate taxation of costs as an indemnity and to substitute taxation of disbursements. The concept included making the winning party whole for expenses incurred in successful litigation." *Nelson v. Nelson Cattle Co.,* 513 N.W.2d 900, 907 (S.D.1994) (citations omitted). Thus, on July 1, 1992, the above statute was replaced by SDCL 15–17–37. (See ¶ 50 for the complete statute).

[¶ 55.] There are sixteen specific costs or disbursements allowed under SDCL 15–17–37:

> [C]osts of telephonic hearings, costs of telephoto or fax charges, fees of witnesses, interpreters, translators, officers, printers, service of process, filing, expenses from telephone calls, copying, costs of original and copies of transcripts and reporter's attendance fees, court appointed experts and other similar expenses and charges.

[¶ 56.] In *Nelson v. Nelson Cattle Co.,* we determined that the inclusion of the words "fees of witnesses" failed to alter the existing method of taxation of expert witness fees at twenty dollars per day plus twenty-one cents per mile under SDCL 19–5–1. *Nelson,* 513 N.W.2d at 907. We further stated that to change the treatment of expert witness fees, the legislature could have easily provided for "fees of witnesses *including reasonable compensation for expert witnesses*" or "fees of witnesses *and a reasonable fee for the compensation and expenses of expert witnesses.*" *Id.* (emphasis in original). Instead, the statute provides only for "court appointed experts." Thus, the purpose behind the statute was thwarted; in other words, the prevailing party was not made whole for all the expenses incurred in successful litigation.

[¶ 57.] Based on the *Nelson* case, it appears that only those expenses "specifically authorized by statute may be taxed as costs" along with "other similar expenses and charges." *Id.* at 906 (citing *Arcon Const. Co. v. S.D. Cement Plant,* 349 N.W.2d 407, 415 (S.D. 1984)); SDCL 15–17–37. An investigative videotape is not specifically authorized by SDCL 15–17–37 and is not within the category of "other similar expenses and charges." Therefore, although it may be an expenditure "necessarily incurred in gathering and procuring evidence or bringing the matter to trial," it is not sufficiently within "other similar expenses and charges." We reverse and remand this issue with instructions to the trial court to subtract the cost of the investigative videotape, $1,162.62, from the amount of costs and disbursements taxed against Zahn.

[¶ 58.] **6. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING ZAHN'S APPLICATION FOR TAXATION OF COSTS.**

[¶ 59.] The trial court ordered Musick to pay Zahn for her costs and dis-

bursements, which were incurred prior to the service of the offer of judgment. Musick argues that Zahn was not entitled to costs because she was not the "prevailing party" per SDCL 15–17–37. Instead, he claims that under SDCL 15–6–68, Zahn is required to pay costs to Musick because the verdict was less than the offer of judgment. He asserts that SDCL 15–6–68 controls over SDCL 15–17–37 to the extent that the two provisions conflict.

[¶ 60.] SDCL 15–6–68 allows a party, who makes an offer of judgment, to recover costs incurred *after* the making of the offer if the judgment is not more favorable than the rejected offer. Musick served Zahn with the offer of judgment on March 22, 1998. While Zahn received a jury verdict, it was not more favorable than the offer from Musick. Therefore, per SDCL 15–6–68, Musick is entitled to tax specifically authorized costs incurred *after* March 22.

[¶ 61.] SDCL 15–17–37 allows the "prevailing party" to recover specific costs and disbursements that were "necessarily incurred in gathering and procuring evidence or bringing the matter to trial." Zahn is the "prevailing party" and is entitled to payment for specifically authorized costs incurred *on or before* March 22, 1998, the date of the first offer of judgment. The offer of judgment statute provides

"with costs then accrued." SDCL 15–6–68. The two statutes, as applied in this case, do not conflict. If Musick's argument were correct, and it is not, he would be getting the benefit of the statute for a period of time preceding his making his offer of judgment. Such a result was never intended.

[¶ 62.] The trial court did not abuse its discretion in awarding Zahn $2,234.56 for specific costs incurred on or before March 22, 1998. Issue 6 is affirmed.

[¶ 63.] In summary, we affirm Issues 1, 2 3, 4 and 6. We affirm the award of costs of copying expenses under Issue 5. We reverse the award of the disbursement for the investigative videotape under Issue 5.

[¶ 64.] MILLER, Chief Justice, and AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.