#24273, #24285-aff in pt & rev in pt-DG

**2007 SD 69**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

TIMOTHY VANDER HEIDE and
RUTH McLAUGHLIN,                                    Plaintiffs and Appellants,

v.

BOKE RANCH, INC., a South                          Defendant, Third Party
Dakota Corporation,                                Plaintiff and Appellee,

v.

BARRY D. BENDER and
MARJORIE J. BENDER,                                Third Party Defendants.

\* \* \* \*
APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*
HONORABLE RANDALL L. MACY
Judge
\* \* \* \*

COURTNEY R. CLAYBORNE of
Clayborne, Loos, Strommen & Gusinsky
Rapid City, South Dakota                           Attorneys for appellants.

BRAD P. GORDON
ROGER A. TELLINGHUISEN of
Tellinghuisen & Gordon
Spearfish, South Dakota                            Attorneys for appellees.

\* \* \* \*
CONSIDERED ON BRIEFS
ON APRIL 23, 2007

OPINION FILED **07/11/07**

GILBERTSON, Chief Justice

[¶1.] On July 13, 2005, Timothy Vander Heide (Timothy) and his wife Ruth McLaughlin (Ruth) (collectively "Vander Heides") filed a complaint in the South Dakota Fourth Judicial Circuit against James Boke (James) and Boke Ranch, Inc. (collectively "Boke"). Vander Heides' complaint alleged an oral agreement modifying a written easement and sought a declaratory judgment as to same, as well as to a determination of the location of the easement and scope of access restrictions. On August 22, 2005, Boke filed his answer. Subsequently, Boke amended his answer and filed a third-party complaint against Barry D. and Marjorie Bender (collectively "Benders") alleging that Benders had expanded the use of the easement beyond its express provisions. On June 12, 2006, a trial was held after which the circuit court entered its memorandum decision, findings of fact, and conclusions of law in favor of Boke as to the issues of oral modification and location of the easement, in part for Boke as to the issue of restriction on access, and in favor of Benders as to the use issue. We affirm in part and reverse in part.

**FACTS AND PROCEDURE**

[¶2.] In June 1982, Lawrence County vacated a road and right-of-way running east and west through the adjoining properties of Loren R. Dodds and Dwaine D. Dodds (collectively "Dodds"), on the west end and the estate of Elvin F. Mitchell (Mitchell), on the east end. The right-of-way reverted to the adjacent property owners, Dodds and Mitchell. The roadway had fallen into disrepair and had essentially become a grass-grown, two-wheel path after years of minimal maintenance. In July 1982, Dodds and Mitchell executed a written easement that

provided for the mutual access and use of the roadway through their respective

properties.[1] Some time during the mid-1980s, Mitchell sold its property to Ruth.

In 1999, Dodds sold their property to Boke.

_____

1.    The July 1982 easement provides in pertinent part:

WHEREAS, Lawrence County, acting through its Board of County Commissioners, has indicated a willingness to vacate that certain right-of-way running from East to West across portions of the above described property as owned by the above respective individual owners, and

WHEREAS, it is the mutual intention of the parties hereto that there be retained an easement across their respective properties and following the current established right-of-way and road for the private use of the parties hereto, their successors and assigns, now therefore, in consideration of the mutual easements hereby granted, the parties do hereby agree as follows:

(1)    That Mitchell does hereby give and grant to Dodds, their successors and assigns, a perpetual easement and covenant running with the land for a continued use of the present roadway across the real property described hereinabove being owned by Mitchell;

(2)    That Dodds does hereby give and grant to Mitchell a perpetual easement and covenant running with the land for the continued use by Mitchell of the present roadway across the real property described hereinabove being owned by Dodds;

(3)    That the granting of the mutual easements hereunder, in no way obligates the grantor to maintain any part of said roadway;

(4)    That the parties, by the execution of this mutual easement, intend to restrict future travel along said roadway and to that extent gates may be placed on the respective properties, provided however, that if such gates are locked by any grantor, such grantor shall be obligated to provide the grantee with the means of opening such gates for their private use in traveling along said roadway covered by these mutual easements.

[¶3.] Thereafter, Boke applied to the Lawrence County Board of Commissioners to rezone his property for development purposes from agricultural to rural residential.[2] Some time during the Fall of 2000, in advance of the rezoning hearing, Boke and Timothy had a discussion about the rezoning application and Boke's intentions. Boke located Timothy in his driveway on the Vander Heide property. The record evinces that the nature of that discussion is in dispute.

[¶4.] At the time Boke was applying to rezone his property, there were several groups opposing any rural development in the area. Timothy has stated that the conversation constituted a negotiation for his agreement not to oppose Boke's rezoning application. At a preliminary hearing he testified, "we weren't big fans of seeing this property developed," but that "I would refrain from objecting to the rezoning of the property if [Boke] would agree to abandon his right to exit any traffic along the existing easement towards the east through our property. . . . [I]t was his property. That was the agreement." Timothy also testified that he believed this to be a one-way restriction, while Boke testified at trial that he believed Timothy reciprocally intended to use that portion of the roadway on the Vander Heide property to provide ingress and egress for any future development established on their property.

[¶5.] In disputing the claim that an oral agreement was consummated during the conversation, Boke indicated that on the day he met with Timothy, their discussion was "casual" and that it actually had a twofold purpose. At trial he

---

2. Boke's parcel consists of 160 acres. His redevelopment plan establishes a subdivision on the property consisting of 32 five-acre parcels.

testified that first, he wanted to thank Timothy for helping his daughter with a weed sprayer. Second, Boke testified that since Ruth, as the deed holder to the Vander Heide property, had been given notice of his rezoning application, he wanted to make himself available prior to the rezoning hearing, as a courtesy, to answer any questions she or Timothy might have about the development plan. Moreover, in refuting the claim of an oral agreement, Boke, a real estate agent testified, "When I make agreements concerning real estate, I have an attorney draw up an agreement. We were discussing what the intent was for the easement and what the intent was for the rezoning."

[¶6.] According to Boke, Timothy had two concerns about the project; the potential affect on the creek that traversed the Vander Heide property, and increased traffic on the portion of the roadway located on their land. Boke testified that he told Timothy "the plans for the rezoning were not to exit any primary traffic that way." He also testified that due to the condition of that part of the roadway, to do otherwise would require making considerable improvements and "that that was not [his] intent." He indicated that the county wanted to maintain the roadway through Vander Heides' property as an emergency access that the two discussed that use and that Timothy did not object.

[¶7.] According to Boke, Timothy expressed no intent to appear at the rezoning hearing to object to the Boke application. He testified that to the contrary, Timothy "was not real pleased with the other parties in the area fighting all the development and he was rather pleased to see [Boke's development] going forward as long as he did not get a lot of extra traffic his way." Boke stated that despite Timothy's interest in creek flow and traffic issues, at no point during the discussion

did he offer a *quid pro quo* wherein he would refrain from objecting to the rezoning in exchange for Boke's favorable consideration of his concerns. Neither did the two discuss the potential for future development of the Vander Heide property nor what, if any, access to such a project Boke would allow over its property.

[¶8.] The events giving way to the dispute between the parties began in 2005. Boke's rezoning application was approved, although through 2005, no work had commenced on the development. In 2003, Ruth quit claimed Timothy an interest in the Vander Heide property. In 2005, Timothy contacted Boke to inform him about a potential sale of the west 200 acres of Vander Heide property adjoining Boke's.

[¶9.] Afterward, the two buyers went to see Boke to discuss access to the property they were proposing to purchase. They had been told by Timothy that the roadway easement would provide them access over Boke's property. Boke testified that during this meeting he told the buyers that there was an easement and since it ran with the land they had a right to whatever it provided. However, he also told them that what the easement provided was uncertain. Timothy testified at a preliminary hearing that when the buyers told Boke that they planned to build a road within that part of the easement on Boke's property, Boke replied that if they did, he would exit his development to the east over the property they were proposing to purchase and the Vander Heide property it adjoined.

[¶10.] Boke then sent a letter to Vander Heides attempting to clarify his understanding of what was provided for by the easement and his belief that if any agreement had been reached between him and Timothy during their conversation in

2000, it provided that neither party was entitled to exit its development traffic over the property of the other. Subsequently, the prospective buyers backed out of the purchase and Vander Heides filed a claim against Boke seeking a declaratory judgment as to the alleged oral modification agreement as well as a determination of the location of the easement and the scope of its access restrictions.

[¶11.] On September 30, 2005, during the pendency of this litigation, Vander Heides sold the 200 acres adjoining Boke's property to Benders. In late October or early November 2005, Benders called Boke to inform him that on the following day they would begin graveling the roadway extending west over Boke's property. Benders were about to start construction of a new home and needed to gravel the roadway to facilitate access for construction and utility workers and their equipment. Boke filed for injunctive relief to stop the graveling operation, but the application was not heard until after the graveling had been completed. Thereafter, Boke sent letters to the Benders and Vander Heides informing them that he would be installing locking gates across the roadway on his property. The letter included keys so that the Benders and Vander Heides could open the gates.

[¶12.] On February 13, 2006, the Vander Heides and Benders filed a motion for a temporary order to restrain Boke from maintaining the locking gates. In his affidavit in support of the application for a temporary restraining order, Timothy again addressed the alleged oral agreement stating that he and Ruth had:

> surrendered and forgave . . . rights to contest and resist
> [Boke's] petition for zoning change on the condition that *and
> not by way of limitation*: (1) [Boke's] development not in any
> way compromise the direction, water quality, or flow of a certain
> creek which runs over and through [the Vander Heide] real
> property, and (2) that [Boke] would develop the property and

mandate the flow of traffic in such a way that traffic from [Boke's] purchasers not proceed east to west past [the Vander Heide] residence on the previously referenced roadway, *and on other conditions not specifically set forth herein.*

(Emphasis added). In addition, Timothy alleged in his affidavit that Boke had violated an oral agreement, stating:

*In violation of* both the easement . . . and the *oral agreement* of the parties, [Boke] has erected fences and gates with a lock across the aforesaid roadway, thus prohibiting and restricting access by [the Vander Heides and Benders]. . . .

(Emphasis added). On April 10, 2006, the circuit court filed an interim order whereby the parties were directed to keep the gates closed but unlocked.

[¶13.] Following a June 12, 2006 trial, the circuit court entered its final judgment on August 30, 2006, finding that the Fall 2000 conversation between Boke and Timothy was not an enforceable oral modification of the written easement; the portion of the easement extending over Vander Heides' property included a deviation, from the original county roadway, around a bridge washout; the easement entitled Boke to install the gates he had placed across that portion of the roadway that extended across his property, but that only the west gate, located between his property and the public right-of-way could be locked; and Benders' graveling of the roadway, extending over Boke's property was a permitted use of the easement.

[¶14.] On appeal, Vander Heides raises the following issues:

1. Whether the circuit court erred in concluding that the Fall 2000 conversation between Boke and Timothy did not constitute an enforceable contract modifying the terms of the July 1982 written easement.

-7-

2. Whether the circuit court erred when it determined that a portion of the easement was located on Vander Heides' property beyond the confines of the original county roadway.

[¶15.] Boke raises the following issue on appeal by notice of review:

3. Whether the circuit court erred by concluding that Benders' graveling of the roadway over Boke's property did not constitute an improper expansion of the easement.

[¶16.] The following issue combines Vander Heides' issue and Boke's issue as to gating and or the locking thereof:

4. Whether the circuit court erred when it concluded that the terms of the easement permitted Boke to install gates across that portion of the roadway on his property, but that he was only entitled to lock the west gate, located between Boke's property and the public right-of-way.

## STANDARD OF REVIEW

[¶17.] "We review the circuit court's findings of fact under the clearly erroneous standard." City of Deadwood v. Summit, Inc., 2000 SD 29, ¶9, 607 NW2d 22, 25 (citations omitted). "Conclusions of law are reviewed under a de novo standard, giving no deference to the circuit court's conclusions of law." Id. (citations omitted).

> Contract interpretation is a question of law reviewable de novo. Because we can review the contract as easily as the trial court, there is no presumption in favor of the trial court's determination. When the meaning of contractual language is plain and unambiguous, construction is not necessary. If a contract is found to be ambiguous the rules of construction apply. Whether the language of a contract is ambiguous is . . . a question of law. We review a circuit court's decision regarding an equitable remedy under the abuse of discretion standard.

Ziegler Furniture and Funeral Home, Inc. v. Cicmanec, 2006 SD 6, ¶14, 709 NW2d 350, 354 (internal citations omitted).

## ANALYSIS AND DECISION

[¶18.]    1.    **Whether the circuit court erred in concluding that the Fall 2000 conversation between Boke and Timothy did not constitute an enforceable contract modifying the terms of the July 1982 written easement.**

[¶19.]    Vander Heides argue that there was a clear expression of Timothy's agreement to forbear from objecting to Boke's rezoning application in exchange for his agreement not to use that portion of the roadway on Vander Heides' property for Boke development ingress and egress.  However, the circuit court concluded in its memorandum decision, incorporated by reference in its findings of fact and conclusions of law, that the Fall 2000 discussion between Timothy and Boke did not contain a sufficient agreement and understanding between the parties to constitute a modification of the written agreement.

[¶20.]    "An agreement is the result of a mutual assent of two parties to certain terms, and, if it be clear that there is no consensus, what may have been written or said becomes immaterial."  Geraets v. Halter, 1999 SD 11, ¶16, 588 NW2d 231, 234 (quoting Watters v. Lincoln, 29 SD 98, 100, 135 NW 712, 713 (1912) (citation omitted)).  "There must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract."  Read v. McKennan Hosp., 2000 SD 66, ¶23, 610 NW2d 782, 786 (citations omitted).  Whether there is mutual assent is a fact question determined by the words and actions of the parties. *Id*. ¶25 (citation omitted).

[¶21.]    Consent is an essential element of a contract. SDCL 53-1-2(2). "Consent must be free, mutual and communicated." Richter v. Industrial Finance Co. Inc., 88 SD 466, 472, 221 NW2d 31, 35 (1974) (citing SDCL 53-3-1). "Consent is not mutual unless the parties all agree upon the same thing in the same sense." SDCL 53-3-3. The existence of mutual consent is determined by considering the parties' words and actions. In re Estate of Neiswender, 2003 SD 50, ¶20, 660 NW2d 249, 253 (citing Coffee Cup Fuel Stops v. Donnelly, 1999 SD 46, 592 NW2d 924).

[¶22.]    In this case, the parties' conflicting testimony, as to their respective understandings about the purpose and result of the Fall 2000 discussion between Boke and Timothy, is sufficient to support the circuit court's determination that no oral agreement was reached. According to Timothy there was a quid pro quo in that he agreed to forbear from objecting to Boke's rezoning application in exchange for an agreement to modify the easement such that traffic from Boke's development would not utilize that portion of the roadway on Vander Heides' property. However, Boke indicated that no such agreement was discussed and that Timothy expressed no intention to object to the rezoning application. According to Boke, the two merely met so that he could explain the development plan and his intent to exit traffic to the west as well as answer any questions that Timothy might have. Timothy also indicated his understanding that the intent to limit development traffic was a one-way restriction upon Boke, while Boke stated during his deposition testimony that he believed Vander Heides would reciprocate by routing any traffic originating from their property over their portion of the roadway. Boke, a real estate agent, further evinced his understanding that there was no agreement when

he indicated that it was his practice to commit to writing any agreement involving real estate, which in this case was not done.

[¶23.] The parties' actions also support the circuit court's determination. The concerns about the development plan that Timothy expressed during his meeting with Boke were limited to traffic and creek-flow issues. Boke later installed locking gates across the roadway on Boke's property. Subsequently, in his February 13, 2006 affidavit, Timothy asserted additional conditions to his alleged agreement to forbear objecting to Boke's rezoning application. Timothy alleged in the affidavit that the traffic and creek-flow conditions were "not by way of limitation" on further conditions and that there were "other conditions not specifically set forth" therein. Still, Timothy goes on to allege in the affidavit that one of these conditions involved Boke's agreement not to install locking gates across the roadway. No evidence was presented to the circuit court as to what the other conditions consisted of nor did Boke express any knowledge as to other concerns that Timothy may have had beyond traffic and the creek.

[¶24.] There was evidentiary support to find that no meeting of the minds or consensus as to the alleged oral agreement was ever demonstrated in the words and actions of Boke and Timothy. In this regard, the essential contract element of consent was missing. Consequently, there was a sufficient basis for the circuit court to determine that there was no oral agreement to modify the written easement.

[¶25.] Moreover, had Boke and Timothy consummated an oral agreement, it would have been subject to the statute of frauds. Under the statute of frauds, "[a]n agreement for the sale of real estate or an interest therein" is not enforceable unless

the contract is in writing and signed by the party to be charged or his duly authorized agent. SDCL 53-8-2(3). An easement is an interest in land subject to the statute of frauds. Spawn v. South Dakota Cent. Ry. Co., 26 SD 1, 127 NW 648, 649 (1910); *see also* Picardi v. Zimmiond, 2004 SD 125, ¶16, 689 NW2d 886, 890 (citing Knight v. Madison, 2001 SD 120, ¶4, 634 NW2d 540, 542 (quoting Gilbert v. KTI, Inc., 765 SW2d 289, 293 (MoApp 1988))). A contract subject to the statute of frauds cannot be modified by oral agreement. Rooney v. Dayton-Hudson Corp., 246 NW2d 170, 175 (Minn 1976) (citing Scheerschmidt v Smith, 77 NW 34 (Minn 1898)).

[¶26.]     Vander Heides read SDCL 53-8-2(3) to mean that the 1982 written easement agreement is not subject to the statute of frauds because the original parties to the easement acquired their respective dominant tenements through mutual grant rather than purchase by "sale" in exchange for money, as that term in the statute is frequently used. However, we are unconvinced by this rationale. We see no reason to distinguish an easement granted in exchange for money from one granted in exchange for any other kind of lawful consideration.

[¶27.]     Alternatively, Vander Heides argue that the 1982 easement is removed from the purview of the statute of frauds by the equitable doctrine of promissory estoppel because they forbore from objecting to Boke's rezoning application in reliance on his promise not to use the roadway on the Vander Heide property for development ingress and egress. *See* Jacobson v. Gulbransen, 2001 SD 33, ¶26, 623 NW2d 84, 91 (citations omitted) (recognizing that an agreement otherwise subject to the statute of frauds is removed therefrom by promissory estoppel when one relies to his detriment on an unfulfilled oral promise).

[¶28.]    "To apply the doctrine of promissory estoppel, the [circuit] court must find:  1) the detriment suffered in reliance must be substantial in an economic sense; 2) the loss to the promisee must have been foreseeable by the promisor; and 3) the promisee must have acted reasonably in justifiable reliance on the promise made."  Garrett v. Bank West, Inc., 459 NW2d 833, 848 (SD 1990) (citing Minor v. Sully Buttes School Dist. No. 58-2, 345 NW2d 48, 51 (SD 1984)).  Promissory estoppel is not applicable if any of these elements are lacking or have not been proven by clear and convincing evidence.  Hahne v. Burr, 2005 SD 108, ¶18, 705 NW2d 867, 873 (citing Century 21 Associated Realty v. Hoffman, 503 NW2d 861, 866 (SD 1993) (citations omitted)).

[¶29.]    The record does not reveal that Vander Heides ever submitted evidence of a substantial economic detriment to the circuit court.  The foregoing analysis reveals that, short of a promise, Boke merely expressed intent not to use the roadway on Vander Heides' property for development ingress and egress.  Further, Timothy's February 13, 2006 affidavit belies the existence of a promise because there was no meeting of the minds.  In the affidavit, Timothy alleges conditions beyond those involving traffic and the creek, from which he originally claimed the basis of an oral agreement with Boke was formed.[3]

---

3.    The circuit court found that Timothy is an attorney "experienced in handling real estate transactions."  Boke contends that as such, he should be held to a higher standard of care in the conduct of his personal business activities.  *See* Columbus Trade Exchange, Inc. v. AMCA Intern. Corp., 763 FSupp 946, 956 (SDOhio 1991) (opining that businesses represented by experienced businessmen should be held to a higher standard in requiring compliance with the statute of frauds and that when parties have extensive business experience they should be

(continued . . .)

[¶30.] Vander Heides' alleged reliance was not in anyway justified given the absence of a promise or at best, one that was vague and uncertain. *See* Werner v. Norwest Bank South Dakota N.A., 499 NW2d 138, 141-42 (SD 1993) (holding that the agreement, to receive a loan in excess of $60,000 upon which the bank's customer relied was too vague and uncertain to support an estoppel claim where the bank's loan officer responded by saying "no problem" to the customer's oral statement estimating a need of $60,000-$80,000). Since Vander Heides' promissory-estoppel argument fails, the 1982 written easement is not removed from the statute of frauds. Therefore, it could not have been modified by oral agreement even if one had been accomplished.

[¶31.] The circuit court also found that Timothy did not acquire an ownership interest in the Vander Heide property until three years after his Fall 2000 discussion with Boke. Therein, the court concluded that, in any case, Timothy had no power to enter into an agreement modifying the easement without some showing of proper authority, of which no evidence was presented. *See* Axtell v. Mueller, 44 SD 220, 183 NW 133, 133 (1921) (holding that a real estate transaction subject to the statute of frauds was invalid when executed by seller's agent without proper authority). *See also* SDCL 43-13-4 (a servitude can be created only by one who has a vested estate in the servient tenement).

---

(. . . continued)

    required to exercise a greater degree of care in their business practices than to merely seal an alleged deal with a handshake). Since Vander Heides failed to satisfy the basic requirements of establishing promissory estoppel, we find it unnecessary to address this additional issue concerning attorneys and leave it for another day.

[¶32.]     As yet another alternative, Vander Heides argue that promissory estoppel can also be invoked to salvage its claim in spite of Timothy's lack of authority in 2000 to enter into an agreement to modify the easement. They aver that application of the equitable remedy is justified in this regard, not to compel enforcement of the alleged oral agreement on the basis that *Vander Heides* forbore objecting to the rezoning application in reliance on Boke's alleged promise, but rather on the basis that *Timothy* forbore a personal right to attend the rezoning hearing in reliance on the same promise. Based on our foregoing analysis as to the efficacy of promissory estoppel, we conclude there is no justification in its application to this set of facts.

[¶33.]     **2.     Whether the circuit court erred when it determined that a portion of the easement was located on Vander Heides' property beyond the confines of the original county roadway.**

[¶34.]     A question as to the location of the easement over a portion of Vander Heides' property arose out of the dispute over the alleged oral modification. A creek intersected the roadway near Vander Heides' residence. There had originally been a bridge over the creek, but it had been washed out. Consequently, the route over the creek is by way of a deviation from the roadway around the washout. The deviation passes over Vander Heides' property near the front yard of their residence. According to Dwaine Dodds (Dwaine), Boke's predecessor in interest who had acquired that property in or around 1957, the bridge had washed out some time during the late 1940s or early 1950s. Dwaine testified at trial that since then the route over the creek has always been by way of the deviation.

[¶35.] While the 1982 easement provides that Dodds and Vander Heides' predecessor in interest, Mitchell, intended to retain a mutual easement following the "established right-of-way and road," section (1) of the agreement also provides that Mitchell grants a perpetual easement running with the land for use of the "present roadway" across the Mitchell property. *See supra* note 1. Dwaine testified that prior to 1982, Mitchells had "supplied a gate and allowed us to go down through their property to get on the road on the other side of the wash." Dwaine also indicated that at the time he and Mitchell signed the easement it was their intent that the deviation be included in the easement.

[¶36.] The circuit court found that the route over the creek was by way of the deviation and in applying rules of contract construction concluded that the deviation was included as part of the "present roadway" as provided in the 1982 easement. Vander Heides argue that the 1982 easement is unambiguous and clear on its face and that the easement extends over the roadway within the original county right-of-way with no deviation. Vander Heides thus aver it was error for the circuit court to consider parole evidence in determining the intent of the parties as to the location of the easement at the time it was executed. We disagree.

[¶37.] In reviewing provisions of the easement, we must first determine whether it is ambiguous as to location. When contract language is unambiguous, extrinsic evidence is not considered because the intent of the parties can be derived from within the four corners of the contract. Spring Brook Acres Water Users Ass'n, Inc. v. George, 505 NW2d 778, 780 n2 (SD 1993) (citation omitted). However, when the language is ambiguous, we may go beyond the four corners to ascertain

-16-

the intent of the parties. AFSCME LOCAL 1922 v. State, 444 NW2d 10, 12 (SD 1989).

> A contract is not rendered ambiguous simply because the parties do not agree on its proper construction or their intent upon executing the contract. Rather, a contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.

Pesicka v. Pesicka, 2000 SD 137, ¶10, 618 NW2d 725, 727 (quoting Singpiel v. Morris, 1998 SD 86, ¶16, 582 NW2d 715, 719 (citations omitted)).

[¶38.]     In this case, the language of the easement is ambiguous as to location because viewed within its four corners the agreement is subject to more than one interpretation. Since the terminology that reserves an easement following the *established right-of-way and road* is ambiguous when juxtaposed with that which provides for the perpetual use of the *present roadway*, we must go beyond the agreement to determine the intent of the parties at the time the easement was executed. Therefore, in light of the testimony of Dwaine, an original party to the easement, we find no error in the circuit court's finding that the easement includes the deviation.[4]

---

4.     Moreover, we have long held that a party is charged with inquiry notice of an easement when ordinary diligence would have revealed its existence. *See Picardi*, 2004 SD 125, 689 NW2d 886; Tan Corp. v. Johnson, 555 NW2d 613 (SD 1996); Peterson v. Beck, 537 NW2d 375 (SD 1995); Townsend v. Yankton Super 8 Motel, Inc., 371 NW2d 162 (SD 1985); Steele v. Pfeifer, 310 NW2d 782 (SD 1981); Wiege v. Knock, 293 NW2d 146 (SD 1980).

Here, there can be no question that when Ruth acquired the Mitchell property, she had knowledge that it was the deviation that afforded users of

(continued . . .)

[¶39.]    **3.    Whether the circuit court erred by concluding that Benders' graveling of the roadway over Boke's property did not constitute an improper expansion of the easement.**

[¶40.]    Boke argues that Benders' graveling of the roadway constituted an improper expansion of the easement in that the gravel surface, when finished, extended beyond the allowed width and that the graveling operation in general was not permissible maintenance, but rather impermissible as an improvement. The circuit court concluded that Benders' graveling of the roadway did not constitute an improper expansion on either the question of width or improvement. Since the easement is silent as to both questions we may go beyond the four corners of the agreement to determine what it allows. *AFSCME LOCAL 1922*, 444 NW2d at 12 (recognizing that when contract language is ambiguous, and does not speak to a subject it would normally be expected to, the court may go beyond the four corners of the contract).

*Width of the Easement*

[¶41.]    "An easement by grant does not require a definite statement as to width, dimensions, or exact location. The extent of an easement by grant can be ascertained either by the words clearly expressed, or by just and sound construction

---

(. . . continued)
the roadway a route across the creek, and not a daredevil jump from one bridge abutment to the other. The roadway was used to access the property owned by the Mitchells. The bridge washed out at least 35 years prior to Ruth's acquisition of the property. As Dwaine testified, the deviation had been the only way to ford the creek since that time.

of the easement document." *Picardi*, 2004 SD 125, ¶16, 689 NW2d at 890 (citations omitted).

[¶42.]     Dwaine testified that while the easement provides that it follows the roadway located within the right-of-way vacated by the county, the intent of the parties was that its width would be confined to the roadway itself. According to Dwaine, the roadway was 12-14 feet wide. He established this width by explaining that it was the same as the width of the gates that he and Mitchell had placed across the roadway. Dwaine stated that the roadway was not wide enough for two vehicles to pass. He went on further to state that it was just wide enough for the Mitchell's "old Army 6x6" that could just pass through the gates.

[¶43.]     Marjorie Bender testified at the trial that a contractor was hired to lay the gravel. She stated that she and her husband wanted to keep the gravel "within the existing area." With that in mind, they asked the contractor to put down two inches of gravel, 10-12 feet wide. Marjorie stated that the charge for the gravel was accordingly based on those dimensions.

[¶44.]     The circuit court concluded that the easement was 12-14 feet wide. Its conclusion is supported by its determination, based on the testimony at trial, that the roadway is also 12-14 feet wide. The circuit court then further determined that Benders did not widen the roadway. This determination is not clearly erroneous given Marjorie's testimony that they paid for a 10-12 foot wide swath of gravel. Accordingly, we find no error with the circuit court's determination that Benders did not expand the easement as to width.

*Maintenance of the Easement*

[¶45.]        Our Legislature has set out that "[t]he extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired." SDCL 43-13-5. This Court has held that the following principle is implicit in this statute:

> the holder of a private easement has the right to limited use or enjoyment of the property only if it is consistent with the general use of the property by the owner, and "neither the physical size nor the purpose or use to which an easement may be put can be expanded or enlarged beyond the terms of the grant of the easement."

Canyon Lake Park, L.L.C. v. Loftus Dental, P.C., 2005 SD 82, ¶27, 700 NW2d 729, 736 (quoting Selway Homeowners Ass'n v. Cummings, 2003 SD 11, ¶28, 657 NW2d 307, 315); *see also Knight*, 2001 SD 120, ¶6, 634 NW2d at 542. In that regard, this Court has concluded that the expansion of an easement beyond the terms of the grant is an undue interference with the reserved rights of the grantor. *Picardi*, 2004 SD 125, ¶21, 689 NW2d at 892 (citation omitted).

[¶46.]        Roads deteriorate over time due to the elements and stress of use. When maintenance or repair are necessary in order for the dominant tenement owner to retain the enjoyment of his estate, he may enter upon the servient tenement to perform such maintenance and repair, while in the process doing no unnecessary injury to the servient estate. Nixon v. Welch, 24 NW2d 476, 481 (Iowa 1947) (holding that the dominant tenement owner had a right to enter onto the servient tenement to clear a drainage ditch where it had an easement that permitted it to drain surface water onto the servient tenement); Laden v. Atkeson, 116 P2d 881, 885-86 (Mont 1941) (affirming an award to the dominant tenement

owner of a ditch right of a designated route across the servient tenement and sufficient amount of land near the head of the ditch so as to accommodate necessary maintenance and that said route and land constituted a "secondary easement" implicit in the primary easement that established the ditch right); Sullivan v. Donohoe, 191 NE 364, 365 (Mass 1934) (holding that the defendant was entitled to take a sufficient amount of the plaintiff's property to conduct repairs and preserve an easement); *compare* Guthrie v. Hardy, 28 P3d 467, 477 (Mont 2001) (affirming the order below enjoining the dominant tenement owner from using its easement for all but ingress and egress since maintenance was performed in a manner that imposed an undue burden upon servient estate).

[¶47.]     Benders purchased the west 200 acres of Vander Heides' property with the intention of building a home. The roadway on Boke's property, which by easement afforded them ingress and egress had, according to Dwaine, been graveled by the county prior to 1982 when it was vacated. However, as Boke, Timothy and Dwaine testified, over the years the roadway had fallen into a state of disrepair becoming little more than a grass-grown, two-wheel path.

[¶48.]     Benders knew that they would be traveling the roadway on a regular basis. Moreover, construction and utility workers, as Benders' invitees, would be traveling back and forth with their equipment between the construction site and the public right-of-way. In order to make the easement safe and usable for the purpose that it was intended, Benders reapplied gravel to the roadway. Boke, now claims that applying gravel to the road constituted an impermissible improvement and expansion of the easement.

[¶49.]     This claim is without merit. Benders had a right to put the easement into a condition that would enable them to retain the enjoyment for which it was intended and provide safe passage to those invitees to whom they authorized access. However, that does not extend to further improvements or to allow public access which were never contemplated by the terms of the easement nor agreed to by the grantor. Boke offers no evidence to show how its reservation was burdened or injured by the graveling.[5] Since Boke's reservation in the servient estate was not infringed upon in any way, we conclude that the graveling of the roadway by Benders was a reasonable and permissible maintenance of the easement and that the circuit court did not err in concluding as much.

[¶50.]     **4.     Whether the circuit court erred when it concluded that the terms of the easement permitted Boke to install gates across that portion of the roadway on his property, but that he was only entitled to lock the west gate, located between Boke's property and the public right-of-way.**

[¶51.]     Since the 1982 easement is unambiguous as to this issue and clear on its face, our review of same is limited to the plain meaning of the pertinent language within its four corners. *See Spring Brook Acres Water Users Ass'n, Inc.*, 505 NW2d at 780 n2.

[¶52.]     The pertinent section of the easement provides:

> That the parties, by the execution of this mutual easement, intend to restrict future travel along said roadway and to that extent *gates may be placed on the respective properties*, provided however, that **if such gates are locked by any grantor**,

---

5.     Contrary to a burden, it seems as though it would be a benefit considering that Boke himself was planning on using the same stretch of roadway to provide ingress and egress for his own 32 parcel development.

such *grantor shall be obligated to provide the grantee with the means of opening such gates* for their private use in traveling along said roadway covered by these mutual easements.

(Emphasis added.)

[¶53.]    The provision places no restriction on the number or location of gates that either party may install on their respective properties. A landowner retains the right to construct a gate unless he or she "explicitly give[s] this right away." Block v. Drake, 2004 SD 72, ¶25, 681 NW2d 460, 467. However, the landowner must not unreasonably "interfere with the use or enjoyment of the easement." *Id.* ¶22 (citing *Knight*, 2001 SD 120, ¶7, 634 NW2d at 543). Here, as a matter of law, the only limitation on Boke's right, as the servient tenement owner, to place locking gates on his property is the extent to which the language of the easement granted that right away to the dominant tenement owners, or any subsequent action by Boke that unreasonably infringed on the ability of the Benders and Vander Heides, as dominant tenement owners, to use and enjoy the easement in conformity therewith. *See* Stanga v. Husman, 2005 SD 36, ¶9, 694 NW2d 716, 718 (citations omitted). The language in the easement evinces the parties' contemplation as to whether "such **gates** are locked by any **grantor**" without limitation. (Emphasis added). In addition, the easement provides that a means of access be made available to the other party as dominant tenement owner in the event locking gates are installed. Therefore, it is clear that the parties to the easement intended that *all* gates could be locked as this right was retained by the landowner and not conveyed away in the easement.

[¶54.] We agree with the circuit court's finding that one of the justifications for Boke's placement of gates is that livestock can be pastured on its property. *See Knight*, 2001 SD 120, ¶7, 634 NW2d at 543 (holding that unless the servient tenement owner expressly agrees otherwise, he reserves the right to use his property for any purpose that does not unreasonably infringe upon the dominant tenement owner's use and enjoyment of the easement). However, we find no support for its conclusion that some gates can be locked while others cannot. "[G]ates may serve a multitude of valuable purposes." *Block*, 2004 SD 72, ¶25, 681 NW2d at 467. In this instance, gates keep cattle in and the public out. We conclude that the easement unambiguously provides that *all* gates that Boke places on his property can be locked and that the only limitation on the number and placement is, as a matter of law, the right of the Benders and Vander Heides to use and enjoy the easement. Since Boke provided the Benders and Vander Heides a means of accessing the gates in question, we find no infringement upon that right under the circumstances. For the foregoing reasons we reverse this issue.

[¶55.] Affirmed in part and reversed in part.

[¶56.] KONENKAMP and MEIERHENRY, Justices, and MILLER, Retired Justice, concur.

[¶57.] ZINTER, Justice, concurs with a writing.

[¶58.] MILLER, Retired Justice, sitting for SABERS, Justice, disqualified.

#24273, #24285

ZINTER, Justice (concurring).

[¶59.]     I concur, except that on Issue 1, I would go no further than to hold that the evidence overwhelmingly established that no oral agreement had been reached modifying the terms of the easement.