1997 SD 137

**Diane R. CRAMER, formerly known as Diane R. Smith, Plaintiff and Appellant,**

v.

**Murray T. SMITH, Defendant and Appellee.**

**No. 19994.**

Supreme Court of South Dakota.

Considered on Briefs Sept. 11, 1997.

Decided Dec. 23, 1997.

Mark F. Marshall and Scott N. Heidepriem of Johnson, Heidepriem, Miner & Marlow, Sioux Falls, for plaintiff and appellant.

Richard A. Johnson of Strange, Farrell, Johnson & Casey, Sioux Falls, for defendant and appellee.

AMUNDSON, Justice.

[¶ 1] Diane R. Cramer (Cramer) appeals the circuit court's decision declining to hold Murray T. Smith (Smith), her former husband, in contempt for an alleged violation of their divorce stipulation and property settlement agreement. We affirm.

court's judgment. Such affirmative action sets a     bad precedent.

## FACTS

[¶ 2] Cramer and Smith were divorced on June 2, 1994. The divorce decree included a negotiated stipulation and agreement (agreement) setting out the property interests of Cramer and Smith in the marital assets. The principal asset of the marriage was an ownership interest in Midwest Coast Transportation, Inc. (MCT). The agreement included three paragraphs (9, 11 and 12) pertaining to the sale of the parties' ownership interest in MCT.

[¶ 3] Paragraph nine of the agreement stated the following:

As provided on Exhibit "A", each party shall receive one-half the gross proceeds due from the remaining note due on the contract for sale of the parties' interest in Midwest Coast Transport, Inc., as the same are paid. Each party shall be responsible for one-half the tax liability resulting therefrom.

[¶ 4] Paragraph eleven goes further in addressing the issue of tax liability for the sale of MCT by providing:

The sum of $152,182 has been paid toward the tax liability resulting from the sale of the parties' interest in Midwest Coast Transport, Inc. Each party shall pay one-half any additional tax liability resulting from said sale. Each party shall escrow the sum of $200,000 in a separate account until such time as the complete income tax liability is determined and paid in full.

[¶ 5] Paragraph twelve of the agreement makes Smith solely responsible for "all other debts and obligations relating to Midwest Coast Transport."

[¶ 6] Cramer contends that Smith has attempted to renege on the provisions and intent of paragraph eleven of the agreement by misappropriating part of the money set aside for the payment of taxes due on the sale of MCT. Specifically, Cramer claims Smith applied part of the $152,182 recited in paragraph eleven of the agreement toward his personal tax obligations for the tax year 1993. Since the MCT sale closing was in 1994, Cramer contends that taxes related to the sale of MCT would not be payable at all for the tax year 1993. Therefore, payments made from the $152,182 by Smith to the IRS for 1993 could not have been incurred in the course of the sale of MCT, which did not occur until 1994. On this basis, Cramer sought to have Smith held in contempt and also to receive judgment against Smith for $47,523, plus interest and costs.

[¶ 7] Smith's evidence revealed that there were taxable events for 1993 associated with the sale of MCT. Smith's expert, David Knudson, the attorney who represented Smith in the sale of MCT, testified that Smith received what are referred to as "draw down"[1] distributions for the fourth quarter of 1993 pursuant to the plan for the sale of MCT. Knudson also testified that the draw down was an integral part of the sale of MCT. Previously, MCT had a history of accumulating capital because only certain distributions were allowed by the partnership agreement. Knudson testified further that, but for the sale of MCT, Smith would not have been able to receive the draw down distributions without an amendment to the partnership agreement. Such an amendment would require the consent of the other members of the partnership. Thus, because the draw down was an extraordinary event that was part of the plan for the sale of MCT, Smith argues that taxes resulting from the draw down are taxes "resulting from the sale of the parties' interest" in MCT in accordance with the agreement.

[¶ 8] The trial court, after considering all the evidence, found there was no basis for finding Smith in contempt. The trial court grounded its decision on the fact that the parties settled a 1993 income tax dispute by filing a joint return and applying part of the $152,182 toward the 1993 tax liability and the balance toward subsequent years' liability due from the sale of MCT. The trial court did find, however, and Smith agreed, that Smith had mistakenly withheld $5,196 from the payments for the sale of MCT that were owed

---

1. Apparently, a "draw down" is a distribution of the capital of a business organization to the shareholders or partners.

Cramer. Cramer appeals raising the following issue:

> Did the circuit court err in determining that Smith had not violated the agreement and was not guilty of contempt?

## STANDARD OF REVIEW

■ [¶ 9 ] A court applies contract principles when interpreting a property settlement agreement incorporated into a divorce decree. *Steffens v. Peterson,* 503 N.W.2d 254, 258 (S.D.1993) (citation omitted). The interpretation of these agreements is a matter of law for the courts to decide. *Hisgen v. Hisgen,* 1996 SD 122, ¶ 4, 554 N.W.2d 494, 496 (citing *Houser v. Houser,* 535 N.W.2d 882, 884 (S.D.1995)). Findings of fact on which the trial court based its decision are reviewed under the clearly erroneous standard. *Adam v. Adam,* 436 N.W.2d 266, 267 (S.D. 1989). The findings of fact of the trial court will not be overturned unless this Court is left with a definite and firm conviction that a mistake has been made. *Hilbrands v. Hilbrands,* 429 N.W.2d 750, 751 (S.D.1988) (citation omitted).

[¶ 10 ] We have set forth the procedure for analyzing a property settlement agreement as follows:

> First, in determining the proper interpretation of a contract the court must seek to ascertain and give effect to the intention of the parties. *Chord v. Pacer Corp.,* 326 N.W.2d 224, 226 (S.D.1982); *Johnson v. Johnson,* 291 N.W.2d 776, 778 (S.D.1980); *Huffman v. Shevlin,* 76 S.D. 84, 89, 72 N.W.2d 852, 855 (1955). In determining the intention of the parties, a court must look to the language that the parties used. *Johnson,* 291 N.W.2d at 778; *Berry v. Benner,* 81 S.D. 610, 617, 139 N.W.2d 285, 289 (1966).
>
> * * *
>
> If the intention of the parties is not clear from the writing, then it is necessary and proper for the court to consider all the circumstances surrounding the execution of the writing and the subsequent acts of the parties. *Janssen v. Muller,* 38 S.D. 611, 614, 162 N.W. 393, 394. The construction given by the parties themselves to the contract as shown by

their acts, if reasonable, will be accorded great weight and usually will be adopted by the court. *Huffman,* 76 S.D. at 89, 72 N.W.2d at 855.

*Malcolm v. Malcolm,* 365 N.W.2d 863, 865 (S.D.1985).

■ [¶ 11 ] Contempt requires a showing of willful disobedience of a valid court order with knowledge of the contents of the order and ability to comply with terms of the order. *Taecker v. Taecker,* 527 N.W.2d 295, 298 (S.D.1995).

## DECISION

**Was the trial court's finding that Smith did not violate the agreement and was not in contempt clearly erroneous?**

[¶ 12 ] The language of paragraph eleven of the agreement provides little support for Cramer's allegation of contempt. The first sentence states that "$152,182 has been paid toward the tax liability resulting from the sale of the parties' interest in Midwest Coast Transport, Inc." This language, agreed to by both parties to the agreement, is in the nature of a recital of fact. Cramer claims in her brief that this language reflected the first quarter estimates that were due on or about April 15, 1994. On its face, the sentence does not appear to create any prospective obligations of either party. It states that money "has been paid." This is a recital of *past* performance, not one of *future* duties. If so, it is not apparent how this could create any obligation on the part of either Cramer or Smith.

■ [¶ 13 ] However, it appears that both parties have actually interpreted the first sentence of paragraph eleven of the agreement to mean $152,182 has been paid *to Smith* who will apply it toward any tax liability resulting from the sale of MCT. This conclusion is supported by the parties' subsequent conduct. Since the agreement does not provide a clear obligation as to the $152,-182 set-aside, and since it has been given a different meaning as evidenced by the subsequent conduct of the parties, "it is necessary and proper for the court to consider all the circumstances surrounding the execution of

the writing and the subsequent acts of the parties." *See Malcolm*, 365 N.W.2d at 865 (citation omitted).

[¶ 14] The actions of the parties in this case provide strong evidence of the intended meaning of their agreement. The correspondence between Cramer's divorce counsel [2] and Smith's divorce counsel demonstrates a dispute surrounding their clients' respective duties to pay taxes after the agreement was finalized. Cramer's counsel sent a letter dated June 21, 1994, to Smith's counsel, contending "[we] did not agree, nor do we now agree, that we will be responsible for any income tax liabilities for the Smiths in 1993 and only those in 1994 which are a direct result of the sale of Midwest Coast." However, the succeeding paragraph of the letter claims "Diane is not responsible for tax on income beyond that for the year 1993, and will file a separate return for 1994." This impliedly admits that Cramer is responsible for income taxes for 1993 in contravention to her previous claim.

[¶ 15] The letter continues in the next paragraph as follows:

Diane will not be signing any joint income tax returns until this matter is resolved. I will hold the income tax documents you have forwarded to me for her signature until we have a written agreement between the parties. If we are not able to reach an agreement, I will ask Diane to consult with John Wanande. I would presume that she would file a separate income tax return for the calendar year of 1993, and claim only that income attributable to her through the parties' joint investments.

■ [¶ 16] Counsel for Smith sent a letter dated June 29, 1994. The letter reveals the following: "I am enclosing the 1993 Joint Federal Income Tax Return for your client's signature. Mr. Smith has agreed to be responsible for the additional tax due of $34,-867.00 and this letter will serve as written declaration of said agreement." After receiving this letter, and after Cramer's attorney stated that Cramer would "not be sign-

ing any joint income tax return until this matter is resolved[,]" Cramer signed the joint income tax return. The resolution of this dispute is presumed by the fact that Cramer entered into the agreement and signed the joint income tax return.[3] Cramer agreed to the provision in their agreement which explained that "$152,182 has been paid" toward the MCT tax liabilities. Therefore, Cramer is bound by the general principle that "one who accepts a written contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation, or other wrongful act by another contracting party." *LPN Trust v. Farrar Outdoor Adver., Inc.*, 1996 SD 97, ¶ 13, 552 N.W.2d 796, 799 (citations omitted).

[¶ 17] It is notable that the agreement does not mention a year or years in which the money set aside for tax obligations arising from the sale of MCT would be used. Logically, federal tax law controls this matter, and this explains why no year is so delineated.

■ [¶ 18] Beyond the fact that the parties appear to have settled the meaning of the agreement by their subsequent actions, the equities of the situation preclude any finding of contempt. The draw down distributions that started in 1993 reduced the value of MCT. The undisputed testimony of Knudson was that if these distributions had not been made, the buyer of MCT would have had to pay a correspondingly higher price. Certainly, the tax on the sale of MCT at this higher price without the draw down would have been "related to the sale" of MCT for purposes of the agreement. Instead, the parties to the sale of MCT chose to reduce the value of the company first through the draw down distributions to an agreed upon book value before the actual sale closing. The fact that this money passed out of MCT before the actual sale finalized does not mean that it was not "related to the sale" of MCT. The buyer and sellers of MCT agreed that these distribu-

---

**2.** Cramer has retained different counsel for this appeal.

**3.** The record reflects that prior to Cramer's assent to the agreement, Cramer's divorce counsel was provided with the opportunity to review all information pertaining to the sale of MCT.

tions would take place in order to reduce the book value of the company to an agreed upon benchmark at the time of closing. Thus, the draw down distributions were inextricably related to the sale of MCT.

[¶ 19 ] Furthermore, the funds received by Smith in the draw down distributions for 1993 had to be taken into account in the equitable division of property in the agreement. *See Caughron v. Caughron,* 418 N.W.2d 791, 792 (S.D.1988) (holding the trial court is required to place a value on all of the property held by the parties and to make an equitable distribution of that property) (citation omitted). Thus, Cramer benefited by the draw down distributions in that they were part of the marital property subject to division. As a result, it is not unfair for Cramer to have to share the burden of pay-·ing the tax that results from the draw down distributions.

[¶ 20 ] Cramer argues that the trial court found in its memorandum decision that the sale of MCT *closed* in 1993 instead of 1994, and that this was clearly erroneous. However, the trial court's memorandum decision speaks in terms of a 1993 taxable income event, not a 1993 closing. The evidence was undisputed that these draw down distributions had tax consequences associated with them that made them 1993 taxable events.

[¶ 21 ] Moreover, the fact the draw down distributions were related to the sale of MCT was established by the testimony of Smith's expert, Knudson. The trial court has had the opportunity to see and hear the testimony of both Knudson and Cramer's expert. Therefore, "[w]e must give due regard to the· opportunity that the trial court has to judge the credibility of the witnesses and to weigh their testimony and accept the evidence, including any reasonable inferences which are favorable to the trial court's determination." *Nelson v. Palmquist,* 363 N.W.2d 570, 572 (S.D.1985) (citation omitted); *see also Nicolaus v. Deming,* 81 S.D. 626, 627, 139 N.W.2d 875, 875 (1966) (concluding that "[i]t is well settled that the credibility of witnesses and weight of evidence is for the trial court"). The trial court found the testimony of Knudson more persuasive than any presented by Cramer or her expert.

[¶ 22 ] Furthermore, a review of the record reveals that the evidence in support of a finding of contempt was murky, at best. Cramer's expert failed to adequately explain how Smith had misappropriated the money and often appeared to make conclusory statements that the money was improperly applied to 1993 taxes without explaining the basis for his opinion. In a case like this, "[w]e ... must assume that the often conflicting and sketchy testimony of both parties was resolved after careful deliberation by the trial court." *Hansen v. G.G.F. Holdings, Inc.,* 376 N.W.2d 341, 344 (S.D.1985) (citation omitted). Thus, we conclude the factual determinations made by the circuit court are not clearly erroneous.

[¶ 23 ] Cramer has not adequately presented facts establishing contempt. Certainly, the necessary showing of willful disobedience has not been established in this case. *See Taecker,* 527 N.W.2d at 298 (holding one element of a contempt finding must include "willful or contumacious disobedience"). Smith used the money set aside in the agreement for payment of taxes that resulted from the plan for the sale of MCT. That money would not have been removed from MCT for the foreseeable future if not for the plan of sale of Smith's interest in MCT. The draw down distributions were reasonably related to the sale of MCT such that Smith's payment of taxes, incurred as a result, does not constitute willful disobedience of the agreement. Thus, the facts do not support a finding of contempt. *See Talbert v. Talbert,* 290 N.W.2d 862, 864 (S.D.1980) ("Without a thorough recitation of facts that support a finding of contempt and without a finding that the four elements of contempt are present, a conclusion that contempt of court has occurred is improper.").

[¶ 24 ] We affirm.

[¶ 25 ] MILLER, C.J., and SABERS, KONENKAMP, and GILBERTSON, JJ., concur.