#24261, #24271-aff in pt, rev in pt & rem-ZINTER, Justice
**2008 SD 57**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JAMES and CAROL DEHAVEN,                     Plaintiffs and Appellants,

    v.

DON and SHERRIE HALL,                     Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE SEVENTH JUDICIAL CIRCUIT
CUSTER COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE MERTON B. TICE, Jr.
Judge

\* \* \* \*

PATRICK M. GINSBACH of
Farrell, Farrell & Ginsbach, PC                     Attorneys for plaintiffs
Hot Springs, South Dakota                     and appellants.

JOHN K. NOONEY of
Thomas, Nooney, Braun, Solay
  & Bernard, LLP                     Attorneys for defendants
Rapid City, South Dakota                     and appellees.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MAY 21, 2007

OPINION FILED 7/2/08

#24261, #24271

ZINTER, Justice

[¶1.] James and Carol DeHaven (DeHavens) appeal from a judgment declaring that Don and Sherrie Hall (Halls) possess a permanent right-of-way easement over DeHavens' property, ordering Halls to reasonably maintain and repair the easement, and granting DeHavens $2,358 in damages as well as taxation of disbursements. Halls filed a notice of review. We affirm in part, reverse in part, and remand.

[¶2.] DeHavens and Halls owned adjacent tracts of land in Custer County, South Dakota. In 1992, DeHavens' predecessor in interest granted Halls a thirty-foot easement across DeHavens' property for purposes of ingress and egress. The easement provided:

> For purposes of ingress and egress, Grantors hereby grant to Grantees a permanent easement, 30' wide. . . . . Said roadway or access right-of-way shall be maintained by GRANTEES and no person or persons shall interfere with GRANTEES' benefit of the easement hereinbefore described. . . .

Halls used the easement for access to their home on a daily basis since 1992. The easement was also used for access to DeHavens' home, as well as access to property owned by James Wirth and Ted Schenk.

[¶3.] Two healthy mature pine trees marked the entrance to the roadway on the easement, which was initially a "two-track" trail. The traveled portion of the roadway was approximately fourteen feet wide. One of the pine trees was within the thirty-foot easement on DeHavens' property, seventeen feet from the easement's west boundary. The other tree was on James Wirth's property and outside the easement. A wire gate was strung between the two trees to confine horses. From

the gate there was a very sharp angle onto the easement roadway that led to DeHavens' home and then to Halls' home.

[¶4.] Since 1992, the Halls graveled, bladed, and plowed snow from the road. In 1998, however, when DeHavens built their home, they improved the roadway from the gate to their driveway. They removed the road grade, ditched the north side of the road, installed a culvert, and surfaced the road. The cost of the improvements was $5,700. DeHavens asked Halls to share in the cost, but Halls did not have the money to do so.

[¶5.] In 2004, DeHavens' contractor examined the easement from its beginning to Halls' property. The portion of the road DeHavens used needed ditch repair and some resurfacing. The condition of the next portion of the road beyond DeHavens' driveway was considerably worse because it was never surfaced and was "beat out" to the extent that it required Halls to drive onto DeHavens' pasture in places to avoid ruts and mudholes. DeHavens' contractor estimated that it would cost $9,700 to repair the entire easement roadway.

[¶6.] In August 2004, DeHavens removed the wire gate that was strung between the two trees. They replaced it with a fourteen-foot steel gate with support poles and rails. They placed the gate ten feet south of the pine trees.

[¶7.] In the fall of 2004, Halls listed their property for sale with a realtor. The realtor told Halls that the realtor was having difficulty selling the property because potential buyers had concerns about maneuvering longer horse trailers through the entry to the easement onto the roadway. Halls ultimately negotiated a sale agreement contingent upon establishing adequate access to their property.

[¶8.] In early October 2004, Halls called DeHavens and complained that the two pine trees at the entry of the easement interfered with access to the easement, and it was difficult to pull Halls' gooseneck trailer through the steel gate due to the angle of the turn. On December 13, 2004, Halls had the trees cut down. The trees were left where they fell; their stumps were left sticking out of the ground.

[¶9.] On December 22, 2004, Halls' attorney advised DeHavens that the steel gate obstructed Halls' use of the easement and if DeHavens did not remove it within five days, Halls would remove it and charge DeHavens for the cost. DeHavens obtained a temporary order restraining Halls from removing the gate. The order was signed on December 28, 2004, and the original was filed on January 3, 2005.

[¶10.] On January 6, 2005, DeHavens filed this lawsuit seeking declaratory relief and damages. A month later, on February 10, 2005, prior to trial, the parties and their respective counsel met in order to resolve the issue of the gate. They reached an agreement to remove the gate. DeHavens understood that in the spring they would remove the steel gate, replace it with a wire gate, and install a thirty-foot permanent metal gate at their property line. Halls understood that they could remove the gate. Following the meeting, Halls, on advice of counsel,[1] removed the gate, cut down the support poles with a chain saw, and left the gate and poles lying in the ditch. Two days later, DeHavens installed a thirty-foot wire gate. The trial court subsequently entered an order to show cause why Halls should not be held in

---

1. Counsel on appeal did not represent Halls at the trial court level.

contempt for violating the temporary restraining order. The court, however, never ruled on the matter.

[¶11.] Prior to trial, the court granted Halls partial summary judgment on DeHavens' claim that the easement had been extinguished due to lack of maintenance. It held that "the subject easement contains no express provision for forfeiture or termination of the said easement in the event of a failure by [Halls] to maintain said easement."

[¶12.] Following a court trial, the court entered findings of fact, conclusions of law, and a judgment. The court concluded that: (1) Halls had a thirty-foot easement across DeHavens' property for ingress and egress; (2) neither the tree within the easement nor the gate, both of which Halls cut down, interfered with Halls' reasonable use of the easement; and (3) Halls, or their successors, as a matter of law under the grant, were responsible for reasonably maintaining the easement. DeHavens were awarded $858 for the cost to repair the gate and support posts, $1,500 for the value of the tree that was in the easement on DeHavens' property, and $162.83 in disbursements.

[¶13.] DeHavens appeal raising five issues:

> Whether, under the terms of the grant, Halls forfeited the easement for failure to maintain it.
>
> Whether, in addition to declaratory relief, DeHavens were entitled to damages related to the maintenance of the easement.
>
> Whether Halls should have been held in contempt for removing the steel gate.

> Whether DeHavens were entitled to damages to clean up the debris from Halls cutting down the tree and damages for the removal of the steel gate.
>
> Whether DeHavens were entitled to additional disbursements.

Halls filed a notice of review raising one issue:

> Whether the trial court erred in awarding DeHavens any damages for replacing the gate, damages for the value of tree, and disbursements.

I

*Extinguishment of an Easement*

[¶14.]    DeHavens argue that the maintenance requirement in the grant is a condition subsequent.  DeHavens therefore contend that by the terms of the grant, Halls' easement was forfeited[2] because they failed to maintain the easement.  In granting Halls' motion for partial summary judgment, the trial court noted that "the subject easement contains no express provision for forfeiture of said easement in the event of a failure of [Halls] to maintain said easement."  In reviewing this summary judgment, "[w]e affirm the circuit court '[if] there are no genuine issues of material fact and the legal questions have been correctly decided.'"  Culhane v. Western Nat. Mut. Ins. Co., 2005 SD 97, ¶ 5, 704 NW2d 287, 289 (quoting Sanford v. Sanford, 2005 SD 34, ¶ 11, 694 NW2d 283, 287).

[¶15.]    The extent of an easement "is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired."  SDCL 43-13-5.

---

2.    Technically, under South Dakota law, easements are extinguished, not forfeited.  SDCL ch 43-13.  *See* Brown v. Hanson, 2007 SD 134, 743 NW2d 677.

> The terms and extent of an easement by grant are ascertained either by the "words clearly expressed, or by just and sound construction" of the easement document. [Picardi v. Zimmiond, 2004 SD 125, ¶ 16, 689 NW2d 886, 890 (*Picardi I*)] (citing Cleveland v. Tinaglia, 1998 SD 91, ¶ 18, 582 NW2d 720, 724 (quoting Salmon v. Bradshaw, 84 SD 500, 505-06, 173 NW2d 281, 284 (1969))). We look first to the language of the grant itself to discover the extent and nature of the easement agreement and its terms. *Salmon*, 84 SD at 505, 173 NW2d at 284 (citation omitted). We review the language used by giving terms their plain and ordinary meaning, and utilize no additional interpretation in the absence of ambiguity. *Id.* (citation omitted). If the terms of the agreement are specific in nature, the terms are 'decisive of the limits of the easement.' *Id.* (quoting 25 AmJur2d, *Easements and Licenses*, § 73). We will not resolve disputes over unambiguous language by resorting to what the parties might have included in a contract. Wessington Springs Educ. Ass'n v. Wessington Springs School Dist. # 36-2, 467 NW2d 101, 104 (SD 1991) (citing Raben v. Schlottman, 77 SD 184, 190-191, 88 NW2d 205, 208 (1958)).

Picardi v. Zimmiond (*Picardi II*), 2005 SD 24, ¶ 20, 693 NW2d 656, 662.

Additionally, "clear language is necessary to create either a condition subsequent or precedent. . . ." City of Huron v. Wilcox, 17 SD 625, 628, 98 NW 88, 89 (1904). "Forfeitures and conditions subsequent not being favored in law, a deed will not be construed to create a conditional estate unless the language used unequivocally indicates an intention . . . to that effect." *Id.*

[¶16.]     In *Kiser v. Warner Robins Air Park Estates, Inc.*, 228 SE2d 795, 798 (Ga 1976), the easement provided: "Second party has the right of ingress and egress over said private driveway provided it maintains same to prevent dust and potholes." The servient estate owner claimed that the easement created a condition subsequent, and that failure to maintain the easement resulted in a forfeiture. The

Supreme Court of Georgia held that the easement had not been forfeited by a failure of maintenance, explaining:

> The breach of a condition subsequent may destroy the party's right under the contract, or may give a right to damages to the other party. Equity seeks to relieve against forfeitures where the rules of construction will allow.
>
> The words in the contract creating a condition subsequent do not provide for a forfeiture of the easement on failure of performance of the condition. They specify a duty on the owner of the dominant estate to keep the easement in repair, which is ordinarily his duty without agreement where the easement is used for the benefit of the dominant estate alone.
>
> The trial judge incorrectly held that the easement had no conditions, but did not err in holding that it had not been forfeited by failure of maintenance.

*Id.* (citations omitted).

[¶17.]     The same is true in this case. The relevant portion of the easement only states that "[s]aid roadway or access right-of-way shall be maintained by GRANTEES. . . ." There is no language that expressly or implicitly provides that the easement will be forfeited if Halls fail to maintain it. The language merely specifies Halls' duty to maintain.

[¶18.]     Because there was no genuine issue of material fact and the trial court correctly decided that the easement contained no clear and unequivocal provision of forfeiture for failure to maintain, partial summary judgment was correctly granted.

## II

### *Damages for Failure to Maintain*

[¶19.] Under the terms of the grant, Halls had a duty to maintain the easement. The trial court found that "since 1992, when Defendants Don and Sherrie Hall acquired their property, they have performed maintenance upon said road, including the purchase of gravel, blading and other maintenance, and have plowed the snow from the road each winter."

[¶20.] In addition, the record reflects that in 1998, DeHavens spent $5,700 to *improve* the easement roadway from the gate to just past the driveway of their new home. Between 1998 and 2000, they spent an additional $661.20 on this section of the roadway that they used. While DeHavens sought contribution from Halls toward the $5,700 expended, they did not seek contributions from the two other property owners who had a right to use the easement. Furthermore, DeHavens did not show that these improvements and maintenances were necessary to prevent damage to the servient estate. *See infra* ¶ 23 *et seq.* Therefore, the trial court did not err in declining to award DeHavens damages for the $5,700 or the $661.20 they spent improving and maintaining the easement from the gate to their driveway.

[¶21.] At the time of trial, according to DeHavens' and Halls' experts, the entire easement roadway was also in need of rework and gravel. The trial court granted DeHavens' request for declaratory relief, concluding that Halls were responsible for maintaining the easement across DeHavens' property. The court ordered Halls to "reasonably maintain the easement during the course of their use of the easement."

[¶22.]     On appeal, DeHavens contend that the declaratory relief was insufficient. They reassert entitlement to the $5,700 for their 1998 improvement work as well as $661.20 for their maintenance work between 1998 and 2004. They further seek monetary recovery for current repairs and maintenance, which DeHavens' contractor estimated would cost $9,700.

[¶23.]     An easement holder (the dominant estate, in this case Halls) owes a limited duty to the landowner (the servient estate, DeHavens) to repair, and maintain the easement. The Restatement (Third) of Property (Servitudes) § 4.13 (2000) defines this duty:

> Unless the terms of a servitude determined under § 4.1 provide otherwise, duties to repair and maintain the servient estate and the improvements used in the enjoyment of a servitude are as follows:
>
> (1)     The beneficiary of an easement or profit has a duty to the holder of the servient estate to repair and maintain the portions of the servient estate and the improvements used in the enjoyment of the servitude that are under the beneficiary's control, to the extent necessary to
>
>> (a)     prevent unreasonable interference with the enjoyment of the servient estate, or
>>
>> (b)     avoid liability of the servient-estate owner to third parties.

[¶24.]     Thus, absent express language in the easement, the beneficiary of the dominant estate has no duty to maintain the easement to the standards the servient tenant may desire for the servient tenant's use of the easement. The Idaho Supreme Court explained:

> The owner of a servient estate has no duty to maintain the easement. The duty of maintaining the easement rests with the easement owner (*i.e.* dominant estate), even when the servient owner landowner uses the easement. That duty requires the easement owner maintain, repair, and protect the easement so as not to create an additional burden on the servient estate or an interference that would damage the land, such as flooding of the servient estate. This duty to maintain does not mean that the easement owner is required to maintain and repair the easement for the benefit of the servient estate.

> * * *

> [A]bsent a showing that the easement owners' maintenance of the easement created an additional burden or interference with the servient estate, the servient estate cannot dictate the standard by which the easement should be maintained, expend funds to maintain it to the level desired by the servient estate and then seek reimbursement for those expenditures and contribution for future expenditures from the easement owners.

Walker v. Boozer, 140 Idaho 451, 455-456, 95 P3d 69, 73-74 (2004) (internal citations omitted). *See also* Baya v. Ulrich, 209 So2d 702, 706 (FlaCtApp 1968) (stating "the dominant owner of the easement . . . [does] not have a duty to repair and maintain it for the benefit of the . . . servient owner"); Lamb v. Lamb, 177 NC 150, 98 SE 307, 309 (1919); 2 Thompson on Real Property § 428 at 709 (1961 Replacement) (stating "the owner of an easement is under no obligation to make repairs except as he may desire to do so for his own advantage, or unless required to do so by contract or prescription"). In the opposite context, this Court recognized the rule in *Vander Heide v. Boke Ranch, Inc.*, 2007 SD 69, ¶ 49, 736 NW2d 828, 838. This Court allowed the dominant estate to gravel an easement because there was no

evidence that the servient estate had been burdened, injured, or infringed upon by the graveling. *Id.*

[¶25.]       Therefore, Halls' duty to maintain the easement was limited to the extent that Halls did not create an additional burden upon or injure DeHavens' land. The trial court found, and the evidence reflects, that Halls did perform some maintenance on the easement. There was no evidence, however, that the state of the easement in 1998 injured DeHavens' estate. Instead, DeHavens' $5,700 was spent in 1998 to *improve* the "two-track trail" from the gate to their new home. Their expenditure was for taking out the road grade, placing new material on the road, ditching the north side of the easement, and installing a culvert. While these improvements and the later maintenances costing $661.20 were desirable to DeHavens, they were unilateral improvements for their benefit. While Halls' maintenance of the easement during the time covered by the $5,700 and $661.20 claims may not have been to the standard DeHavens desired, DeHavens did not prove that Halls' maintenance (or lack thereof) unreasonably interfered with DeHavens' enjoyment of the estate or created a burden on the estate. Under these circumstances, the trial court did not err in declining to award those expenditures as damages for DeHavens' improvements to the easement.

[¶26.]       Concerning the $9,700 for current repairs/maintenance, DeHavens presented evidence that some of those repairs were necessary to fill holes and make the easement passable. The evidence did not, however, distinguish between improvements and repairs that DeHavens desired for their use, and the maintenance or repair that was necessary to prevent harm to the servient estate.

The portion of this request that related to preventing harm to DeHavens' land was recoverable as a lack of maintenance in some areas was obviously harming the servient estate.  The evidence is undisputed that the impassable portion caused Halls to drive around the easement on to DeHavens' land.  DeHavens, however, presented no evidence itemizing the amount necessary to repair that section of the easement.  The rest of DeHavens' claim related to improvements and repairs DeHavens desired to facilitate their personal use of the easement.  They did not tie the balance of this claim to repairs that would be necessary to keep the easement from harming the servient estate.  Furthermore, DeHavens asked for declaratory relief that Halls be ordered to make the repairs to the easement, *or in the alternative* be ordered to pay DeHavens $9,700.  The court's judgment fulfilled DeHavens' request for alternative relief by ordering Halls to "reasonably maintain the easement and repair the easement during the course of their use of the easement."  Because the trial court granted DeHavens' alternative request for relief, we affirm on this issue.

### III

#### *Contempt*

[¶27.]     An order temporarily restraining Halls from removing the gate was signed on December 28, 2004, and filed on January 3, 2005.  DeHavens filed a motion to extend this order on February 5, 2005, and filed a motion for preliminary injunction to restrain Halls from removing the gate on February 8, 2005.  The trial court did not act on either motion.  On February 10, 2005, after Halls cut down the gate, DeHavens filed an affidavit seeking an order holding Halls in contempt for

violating the temporary restraining order. The trial court signed an order to show cause[3] that day. Although the order was filed on February 14, 2005, no formal action was taken on the order to show cause. DeHavens contend that the trial court erred in failing to hold Halls in contempt for cutting down the gate in violation of the December 28, 2005 temporary restraining order.

[¶28.]       "Contempt requires a showing of willful disobedience of a valid court order with knowledge of the contents of the order and ability to comply with terms of the order." Cramer v. Smith, 1997 SD 137, ¶ 11, 572 NW2d 445, 447. An order "becomes complete and effective when reduced to writing, signed by the court or judge, attested by the clerk, and filed in the clerk's office." SDCL 15-6-58. SDCL 15-6-65(b) governs the period of time the temporary restraining orders remain effective thereafter:

> Every temporary restraining order granted without notice
> . . . shall expire by its terms within such time after
> entry, not to exceed ten days, as the court fixes, unless
> within the time so fixed the order, for good cause shown,
> is extended for a like period or unless the party against
> whom the order is directed consents that it may be
> extended for a longer period of time.
>
> * * *
>
> When the motion comes on for hearing the party who
> obtained the temporary restraining order shall proceed
> with the application for a preliminary injunction and, if
> he does not do so, the court shall dissolve the temporary
> restraining order.

[¶29.]       In this case, the December 28, 2004 temporary restraining order became effective upon filing on January 3, 2005. The order then restrained Halls

---

3.       We treat this as a motion.

from removing the gate "until further order of the court," but it did not set a date for hearing. Further, by operation of law, the temporary restraining order expired on January 13, 2005. *See* SDCL 15-6-65(b). Thus, by February 2005, when DeHavens sought to extend the temporary restraining order, obtain a preliminary injunction, and hold Halls in contempt for violating the order, the temporary restraining order had already expired and was of no legal effect. *See* Golden v. Oahe Enter., Inc., 90 SD 263, 240 NW2d 102 (1976). In the absence of a valid court order, Halls could not be held in contempt.

IV

*Damages for Tree Removal and*
*Cleanup of Debris*

[¶30.] In December 2004, Halls cut down the two mature pine trees at the entry to the easement. While one tree was on a third party's property, the other was located on the easement seventeen feet from the western boundary of Halls' thirty-foot wide easement. The trial court found that this tree did not interfere with Halls' reasonable use of the easement. Therefore, it awarded DeHavens $1,500 for the stipulated value of the tree. *See* SDCL 21-3-10. The court did not award DeHavens any damages for the cost of removing the tree stump and debris. DeHavens contend that they are entitled to the cost of cleaning up. Halls, by notice of review, contend that their removal of the tree was consistent with the terms of the ingress/egress easement, and therefore, the trial court erred in awarding any damages.

A

*Tree Removal*

[¶31.]     In the absence of contrary language in the easement, a servient owner

may reasonably use that portion of its real property subject to an egress, ingress,

and roadway easement for its own purposes up to the point where such uses

substantially interfere with the dominant owner's reasonable use of the easement.

*Picardi II*, 2005 SD 24, ¶ 32, 693 NW2d at 665 (citing Maasen v. Shaw, 133 SW3d

514, 520 (MoCtApp 2004)).  Thus,

> [t]he right to "store, park, plant, and construct on the *non-roadway* portions of the easement remain with the servient owner." *Id.* (citing Earth City Crescent v. Assoc's v. LAGF Assoc's-Mo, LLC, 60 SW3d 44, 46 (MoCtApp 2001); Frain v. Brda, 863 SW2d 17, 19 (MoCtApp 1993); Baum v. Glen Park Properties, 660 SW2d 723, 726-27 (MoCtApp 1983); Schroer v. Brooks, 204 MoApp 567, 224 SW 53, 57 (1920)).  The servient tenement owner's uses of *non-roadway* portions of the easement include parking, signage, curbing, planting or removal of trees, sod and other vegetation. *Id.*

*Id.* (emphasis added).  The dominant owner may only remove an obstruction when it

interferes with the dominant owner's right of use.  *Maasen,* 133 SW3d at 520.

"[T]he dominant owner may remove trees and earth that obstruct the easement

roadway." *Id.*

[¶32.]     Halls were originally granted a thirty-foot wide permanent easement

for purposes of ingress and egress.  At the point of entry, however, Halls only

utilized approximately fourteen feet of the easement.[4]  DeHavens, as the owners of

---

4.     We have noted that the failure to "make use of the full rights of the easement area as contained in the grant will not lessen the extent of the original grant in the future." *Picardi I* , 2004 SD 125, ¶ 16, 689 NW2d at 890.

the land underlying the easement, had the right to use the portion of the easement not used for ingress and egress: DeHavens' right was exercisable . . . :

> [I]n any reasonable manner that does not interfere with [Halls'] ability to travel upon the roadway. This includes the right to use the ditches of the current roadway, and the ditches of any future roadway, for parking signage, fences, fence posts, curbing, planting or removal of trees, sod, or other vegetation.

*Picardi II*, 2005 SD 24, ¶ 34, 693 NW2d at 665.

[¶33.] In this case the trial court found, and the evidence reflects, that the tree did not interfere with the Halls' reasonable use of the easement. While potential purchasers complained of difficulty accessing the easement, Halls did not present evidence that they were expanding the roadway from its current width to the maximum allowable width or that removal of the tree was necessary because it obstructed the roadway.[5] Because the trial court found that the tree did not interfere with Halls' reasonable use of the easement, Halls were not entitled to remove the tree.

[¶34.] With respect to damages, SDCL 21-3-10 provides in part:

> For the wrongful injury to timber, trees, . . . or removal thereof the measure of damages is three times such a sum as would compensate for the actual detriment[.]

The parties stipulated that the value of the tree was $500, and the court awarded $1,500 for the tree. The trial court did not err in awarding damages.

---

5. Had DeHavens proven that case, the tree may have been rightfully removed. *See Picardi II*, 2005 SD 24, ¶ 33, 693 NW2d at 665.

B

*Cleanup of Tree Debris*

[¶35.]　　　DeHavens contend that the trial court erred by not awarding the costs they would incur to remove the tree stump and debris.　They argue that leaving the stump may eventually lead to decay and harm the easement, which entitles them to damages.

[¶36.]　　　DeHavens, however, presented no evidence that Halls' failure to remove the stump and tree debris in this area of the Black Hills created an additional burden on the servient estate or an interference that damaged the land. *See Vander Heide*, 2007 SD 69, ¶ 49, 736 NW2d at 838.　In the absence of such proof, the trial court did not err in failing to award damages for cleanup costs.

V

*Damages for Gate Removal and*
*Cleanup of Gate Debris*

[¶37.]　　　On February 20, 2005, the parties and their counsel reached an agreement that the gate would be removed.　James DeHaven testified that the agreement contemplated removal of the gate posts with a front loader so that the posts could be reused.　He further testified that under the agreement, he was allowed to put up a thirty-foot gate before the other gate was removed in order to prevent his horses from escaping.　Don Hall testified that his understanding of the agreement was that he could remove the gate, and he did so immediately.　The trial court did not address this dispute of fact.　Instead, it found that the gate did not interfere with Halls' reasonable use of the easement, and awarded $858 "for the cost to repair the gate and support posts."

A

*Gate Removal*

[¶38.]        The parties' agreement concerning the removal of the gate is crucial to determining if the award of damages for its removal was appropriate.  The trial courts' findings, however, fail to address the issue of the agreement concerning when, how, and who could remove the gate.  "The trial court is required to make findings on all disputed material issues. . . ."  Hanks v. Hanks, 334 NW2d 856, 860 (SD 1983).  Therefore, we reverse the award of damages, and remand for the entry of findings of fact, conclusions of law, and a reconsideration in light of the parties' agreement.

B

*Cleanup of Gate Debris*

[¶39.]        As with the tree debris, DeHavens have not shown that Halls' failure to remove the gate debris created an additional burden on the servient estate or an interference that damaged the land.  In the absence of such proof, the trial court did not err in failing to award damages for cleanup costs.

VI

*Disbursements*

[¶40.]        The trial court awarded DeHavens $162.83 in disbursements.  It disallowed disbursements for photographs, maps, copying costs, fax charges, and witness fees for a subpoenaed witness who did not testify.  The court denied these disbursements, opining that "unless there's unusual circumstances, I don't believe the Supreme Court feels that the trial court should grant [disbursements] by and

large. . . . They are very narrow in what they allow in the mind of this court."

The trial court was also concerned with the lack of itemization of some of the

disbursements. We address both reasons for the denial of disbursements.

[¶41.] "It is well settled that costs and disbursements are creatures of

statute, and cannot be allowed in the absence of statutory authority." Elfring v.

New Birdsell Co., 17 SD 350, 351, 96 NW 703, 704 (1903).

> [T]he taxation of costs was unknown to the common law,
> and . . . courts are without the inherent power to tax
> costs. The authority to tax such costs should not be
> implied, but must rest upon a clear legislative grant of
> power to do so.

Matter of Estate of O'Keefe, 1998 SD 92, ¶ 18, 583 NW2d 138, 142 (quoting Salem

Sales, Inc. v. Brown, 443 NW2d 14, 15 (SD 1989)).

[¶42.] Prior to 1992, costs included indemnity. Nelson v. Nelson Cattle Co.,

513 NW2d 900, 907 n16 (SD 1994). SDCL 15-17-1 (1919) provided:

> In civil actions and in certiorari, mandamus, and
> prohibition proceedings, there may be allowed to the
> prevailing party certain sums by way of indemnity for his
> expenses in the action or proceeding, which allowances
> are termed "costs."

Under that statutory scheme, costs included flat fees as indemnification for

expenses incurred in preparing for and going to trial. SDCL 15-17-2 (1977) detailed

the items and amounts allowed:

> The costs, except as otherwise provided in special cases,
> allowed in civil actions shall be as follows:
>
> > (1) To the plaintiff for all proceedings before
> > notice of trial in actions arising on contract
> > for the recovery of money only, fifteen
> > dollars; in other actions, twenty-five dollars;
> > for all proceedings after notice of and before

trial, six dollars; for each additional defendant served with process not exceeding ten, two dollars;

(2) To the defendant for all proceedings before notice of trial, fifteen dollars; and for all proceedings after notice of and before trial, six dollars;

(3) To either party when a new trial shall be had for all proceedings after granting of and before such new trial, five dollars, for attending upon and taking the deposition of a witness conditionally or tending to perpetuate his testimony, two dollars, for drawing interrogatories to annex to a commission for the taking of testimony, two dollars;

(4) For every trial of an issue of fact, five dollars;

(5) To either party for every term not exceeding five at which the cause is necessarily on the calendar and is not tried or is postponed by order of the court, three dollars; and for every term not exceeding five, excluding the term at which the cause is argued in the Supreme Court, five dollars.

SDCL 15-17-3 (1977) specified the costs allowed in special proceedings. SDCL 15-17-16 (1980) governed other actions:

In actions other than those specified in §§ 15-17-11, 15-17-12, 15-17-14 and 15-17-15,[6] costs may be allowed or not, in the discretion of the court.

---

6. SDCL 15-17-11 listed actions where costs were allowed as a matter of course to the plaintiff. SDCL 15-17-12 mentioned tort actions in which the plaintiff's costs were limited by damages. SDCL 15-17-14 limited a plaintiff's costs in multiple actions on a single cause of action. SDCL 15-17-15 allowed costs as a matter of course to the defendant in actions mentioned in SDCL 15-17-11 to 15-17-14, unless the plaintiff was entitled to them.

[¶43.]      In cases where a party was allowed to recover costs, miscellaneous fees

and evidentiary out-of-pocket expenses were also allowed.  *Nelson*, 513 NW2d at

907 n16.  SDCL 15-17-4 (1989) provided:

> In all cases when a party is allowed to recover costs, the
> clerk shall also tax as a part of the judgment the
> allowance of such party's witnesses', interpreters',
> translators', officers', and printers' fees, reasonable
> copying fees, fees for the service of process, filing fees and
> the necessary expense of taking depositions and procuring
> necessary evidence.

[¶44.]      In the 1992 legislative session, the State Bar promoted a legislative

package "to reform the taxation of costs.  The proposal was to eliminate the taxation

of costs as an indemnity and to substitute taxation of disbursements."  *Nelson*, 513

NW2d at 907.  The legislative package was enacted.  1992 SD SessL ch 148.  As a

result, SDCL 15-17-1, 15-17-2, 15-17-3, 15-17-4, 15-17-16, as well as the rest of the

chapter on costs, were repealed.  1992 SD SessL ch 148, § 26.  They were replaced

by twenty-five new sections, beginning with SDCL 15-17-36, which deal with the

recovery of disbursements, *i.e.,* out-of-pocket expenses rather than indemnity for the

expense of going to court.

[¶45.]      Under the new statutory scheme,

> The concept of costs as an indemnity to be recovered by a
> prevailing party is abolished in the courts of South
> Dakota.  Whenever the term, costs, is used, it means
> disbursements as defined in § 15-17-37.

SDCL 15-17-36.  The abolishment of the concept of costs as indemnity was

substituted with the concept of "making the winning party whole for expenses

incurred in successful litigation.  SDCL 15-17-36."  *Nelson*, 513 NW2d at 907.  Our

jurisprudence with respect to allowable expenses has not, however, significantly

changed. This appears to be because SDCL 15-17-4 (repealed) (defining recoverable out-of-pocket expenses) is almost identical to the disbursements allowed under SDCL 15-17-37.

[¶46.] Today, with the elimination of indemnification, recoverable expenses (disbursements) continue to be "the actual out-of-pocket expenditures" defined in SDCL 15-17-37. *Nelson*, 513 NW2d at 907. SDCL 15-17-37 provides:

> The prevailing party in a civil action or special proceeding may recover expenditures necessarily incurred in gathering and procuring evidence or bringing the matter to trial. Such expenditures include costs of telephonic hearings, costs of telephoto or fax charges, fees of witnesses, interpreters, translators, officers, printers, service of process, filing, expenses from telephone calls, copying, costs of original and copies of transcripts and reporter's attendance fees, court appointed experts, and other similar expenses and charges. These expenditures are termed "disbursements" and are taxed pursuant to § 15-6-54(d).

The new statutory scheme also allows the discretionary taxation of disbursements without specific statutory authorization:

> If there is no specific statutory authorization allowed for taxation of disbursements in a civil action or special proceeding, taxation of disbursements may be allowed in the discretion of the court.

SDCL 15-17-44.

[¶47.] In either case, a party who wishes to recover disbursements must file an application that includes a "statement in detail" of the disbursements claimed, which "shall be verified by affidavit." SDCL 15-6-54(d). Furthermore, under other provisions "[t]he court may limit the taxation of disbursements in the interests of

justice," SDCL 15-17-52, and "[t]he court may reduce or disallow a taxation of disbursements that would be oppressive or work a hardship." SDCL 15-17-33.

[¶48.] In interpreting the general disbursement provision, SDCL 15-17-37, this Court has focused on its second sentence, which enumerates "sixteen specific costs or disbursements allowed." Zahn v. Musick, 2006 SD 26, ¶ 55, 605 NW2d 823, 834. While this Court has recognized that the trial court has discretion under SDCL 15-17-37, we have urged courts to use cautious restraint and allow only those disbursements "specifically authorized by [SDCL 15-17-37]." Lewis v. Aslesen, 2001 SD 131, ¶ 10, 635 NW2d 744, 747. Thus, the statutory language of the enumerated items in the second sentence of SDCL 15-17-37 has been followed "word for word." Atkins v. Statmeyer, 1999 SD 131, ¶ 33, 600 NW2d 891, 900. As a result, expert witness fees,[7] investigation fees and impairment ratings,[8] surveying costs,[9] investigative videotapes,[10] abstract and audit fees,[11] computerized legal research fees,[12] and book, mileage and motel expenses[13] have not been allowed as taxable disbursements because they were not referred to in the sixteen enumerated items. In those cases, this Court has been "extremely hesitant to allow disbursements for

7.      *Nelson*, 513 NW2d at 907.

8.      *Atkins*, 1999 SD 131, ¶ 33, 600 NW2d 900.

9.      *Lewis*, 2001 SD 131, ¶ 10, 635 NW2d 747.

10.     *Zahn*, 2006 SD 26, ¶ 57, 605 NW2d at 834.

11.     City of Aberdeen v. Rich, 2003 SD 27, ¶ 29, 658 NW2d 775, 783.

12.     Casillas v. Schubauer, 2006 SD 42, ¶ 28, 714 NW2d 84, 91.

'other similar expenses and charges' as mentioned in SDCL 15-17-37." *City of Aberdeen*, 2003 SD 27, ¶ 27, 658 NW2d at 782.

[¶49.] The problem in application of the statute has arisen because, in addition to the disbursements specifically enumerated in the second sentence of SDCL 15-17-37, recovery may be allowed under the first sentence for "expenditures necessarily incurred in gathering and procuring evidence or bringing the matter to trial." Although the first sentence is broad and literally unlimited, the language was included in the predecessor statute (SDCL 15-17-4 (1989)) allowing out-of-pocket expenses, and this Court has been reluctant to apply a new, expansive interpretation of recoverable disbursements. Thus, in *Nelson*, *supra*, this Court denied disbursements recognizing that expert witnesses are necessary in many medical malpractice, legal malpractice, and condemnation cases. Also, in *Zahn*, *supra*, a personal injury case, this Court denied a request for the cost of an investigative video tape even though we recognized it was "necessarily incurred in gathering and procuring evidence or bringing the matter to trial." 2006 SD 26, ¶ 57, 605 NW2d at 834. In both cases, the disbursements were not allowed because they were not specifically authorized in the second sentence of SDCL 15-17-37.

[¶50.] This restrictive interpretation of this disbursement statute has continued even though the second sentence is not an exclusive list of recoverable disbursements. We have often noted that language describing a general subject followed by language "including" specific examples is not intended to be an exclusive

---

13. Genetics Research v. J K Mill-Iron Ranch, 535 NW2d 839, 846 (SD 1995) (also concluding that the expenses are not allowable under SDCL 15-17-44).

list.  Peterson v. Peterson, 2000 SD 58, 610 NW2d 69; Hautala v. Hautala, 417

NW2d 879 (SD 1988).

[¶51.]      Nevertheless, it is well-settled that where general words precede the

enumeration of particular classes of things, the *ejusdem generis* cannon of

construction requires that the general words will be construed as applying only to

things of the same general kind as those enumerated.  Grievance of O'Neill, 347

NW2d 887 (SD 1984).  Accordingly, while the first sentence of SDCL 15-17-37 allows

the recovery of "expenditures necessarily incurred in gathering and procuring

evidence or bringing the matter to trial," and the last phrase of the second sentence

includes "other similar expenses and charges," recoverable expenditures under the

first sentence must be of the same general kind as those specifically enumerated in

the second sentence.

[¶52.]      Consequently, the prevailing party in a civil action may recover

necessary expenditures "incurred in gathering and procuring evidence or bringing

the matter to trial" and "other similar expenses and charges" if these expenditures,

expenses and charges are of the same general kind as the . . .

> costs of telephone hearings, costs of telephoto or fax
> charges, fees of witnesses, interpreters, translators,
> officers, printer, service of process, filing, expenses from
> telephone calls, copying, costs of original and copies of
> transcripts and reporter's attendance fees, court
> appointed experts[.]

SDCL 15-17-37.  And, even those costs are not necessarily required.  The statutes

give considerable discretion in denying recoverable disbursements:

> [A] court is not required to grant recovery for
> disbursements simply because a party has achieved the
> status of a prevailing party.  While SDCL 15-17-37 grants

> no discretion, SDCL 15-17-52 allows a court to "limit the taxation of disbursements in the interests of justice." This statute grants discretion to deny recovery of disbursements even though SDCL 15-17-37 does not.

Full House, Inc. v. Stell, 2002 SD 14, ¶ 25, 640 NW2d 61, 67 (quoting Culhane, v. Michels, 2000 SD 101, ¶ 33, 615 NW2d 580, 590). Furthermore, the prevailing party who seeks disbursement bears the responsibility of documenting, itemizing, and justifying the necessary expenditures that it seeks. SDCL 15-6-54(b) provides in part:

> If a party wishes to have disbursements and costs of the action assessed, that party must file an application for the taxation of costs. . . . The application shall include a statement *in detail* of the costs and disbursements claimed and shall be verified by affidavit. (Emphasis added).

Finally, allowable disbursements must be proven. *Atkins,* 1999 SD 131, ¶ 32, 600 NW2d at 900.

[¶53.] In this case, the trial court awarded DeHavens $162.83 as disbursements. It disallowed disbursements for photographs, maps, copying costs, fax charges and witness fees for a subpoenaed witness who was not called to testify. The court denied these disbursements because of our restrictive interpretation of the statutes. The court was also concerned with the lack of itemization for some of the disbursements claimed.

[¶54.] In light of the 1992 legislation regarding the recovery of disbursements, the trial court was overly restrictive in its view of the type of disbursements that are recoverable. Nevertheless, it did not abuse its discretion by denying the disbursements it did because of DeHavens' failure of proof.

[¶55.]     A review of the exhibits attached to DeHavens' application and affidavit for "costs" reveals a list of claimed disbursements with a lump sum amount for each item. For example, DeHavens sought $228.75 for copies and $195 for fax charges. DeHavens did not, however, itemize the number of copies or faxes, the price per copy or fax, and the necessary purpose for the copies and faxes. The same was true with other items requested. In addition, embedded within the list of disbursements sought, DeHavens inexplicably requested payment for cement, reflector tape, and two lunches with their attorney. Under these circumstances, the trial court did not abuse its discretion in denying the omitted disbursements.

[¶56.]     The judgment is affirmed in part, reversed in part, and remanded.

[¶57.]     GILBERTSON, Chief Justice, and KONENKAMP and MEIERHENRY, Justices, concur.

[¶58.]     SABERS, Justice, concurs in part and concurs in result in part.

SABERS, Justice (concurring in part and concurring in result in part).

[¶59.]     I concur except as to Issue VI, Disbursements, where I concur in result because the trial court did not abuse its discretion in denying the disbursements for lack of detailed proof.